# Exhibit B

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK



-------------------------------------------------------------------- x

DANA BYRNE, GALE LaCAVA, JOHN CONROY,
PAUL CRESTI, DERRIN HAWKINS, ANNETTE
ILAGAN, ROGER KLEIN, VLADIMIR KVINT, KEVIN
McCAUSLAND, BRIAN MENEGHIN, STEVE
MYLENSKI, JAMIE PALAZZOLO, BELINDA PARK,
SEAN ROCHE, SAL TOMASIELLO, BRIAN WONG, on
behalf of themselves individually and on behalf of all other
similarly situated persons,

                    Plaintiffs,

        v.

RMJM, INC.; RMJM GROUP, INC.; RMJM
HILLIER GROUP, INC.; RMJM HILLIER
WORLDWIDE, INC.; RMJM WORLDWIDE, INC.;
RICHARD BAILES; DECLAN THOMPSON; FRASER
MORRISON; and PETER MORRISON,

                    Defendants.

-------------------------------------------------------------------- x

Civil Action No. 12-civ-8203 (PKC)

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

Dana Byrne, Gale LaCava, John Conroy, Paul Cresti, Derrin Hawkins, Annette Ilagan,

Roger Klein, Vladimir Kvint, Kevin McCausland, Brian Meneghin, Steve Mylenski, Jamie

Palazzolo, Belinda Park, Sean Roche, Sal Tomasiello and Brian Wong (collectively "Plaintiffs"),

by and through counsel, Thompson Wigdor LLP, as and for the Second Amended Complaint in

this action against Defendants RMJM, Inc., RMJM Group, Inc., RMJM Hillier Group, Inc.,

RMJM Hillier Worldwide, Inc. RMJM Worldwide, Inc. (together, "RMJM"), Richard Bailes,

Declan Thompson, Fraser Morrison and Peter Morrison (collectively, the "Individual

Defendants") (RMJM and the Individual Defendants together, the "Defendants"), on behalf of

themselves individually, and on behalf of the FLSA Collective, the NYLL Class, the IRC Class,

the ERISA Class and the New York Common Law Class (all as defined below), hereby allege as follows:

## NATURE OF THE CLAIMS

1.     Plaintiffs bring this action against Defendants for numerous unlawful employment practices that have resulted in substantial damage to Plaintiffs and numerous other employees. Defendants have intentionally withheld, and continue to withhold, earned wages, benefits, 401(k) employee elective deferrals, and other wage supplements, including severance, from its employees.  Not only have wages, benefits, 401(k) employee elective deferrals and other wage supplements, including severance, been intentionally retained and withheld from employees, but even when some such items have later been paid, they have been, and are, frequently paid days, weeks or even months later than agreed upon, promised and required by law.  For employees who have separated from employment, Defendants have withheld, and continue to withhold, the remaining wages and other compensation, including severance, due at separation.  Furthermore, due to Defendants' retention of and failure to pay the premiums for its employees' benefits -- such as health, dental and group term life insurance -- the policies have lapsed and been cancelled for non-payment.  Defendants did not notify their employees of the lapse in benefit premium payments or the policy cancellations.  As a result, employees lost certain benefits, without their knowledge.  Moreover, Defendants unlawfully retained and failed to pay compensation allocated as 401(k) employee elective deferrals, without informing employees of the retention of their compensation.  The items described above are just a portion of the completely outrageous and unlawful conduct committed by Defendants against their employees, which is described at greater length herein.  For these, and other unlawful actions by Defendants described below, Plaintiffs bring this action seeking relief for themselves and others.

2.      Moreover, Defendants -- including but not limited to Declan Thompson specifically -- have recently threatened to bring an action against certain former employees if their individual claims were not settled at amounts unilaterally determined by Defendants.  These threats, and any anticipated action ultimately brought, constitute unlawful retaliation.

3.      Plaintiffs bring this action, on behalf of themselves individually and all similarly-situated employees who elect to opt-in to this action pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), to recover damages on account of Defendants' (i) unlawful failure to pay the minimum wage and (ii) unlawful failure to pay premium overtime compensation.

4.      Plaintiffs also bring this action as an individual and representative action under New York Labor Law Art. 6 §§ 190 *et seq.* and Art. 19 §§ 650 *et seq.* ("NYLL"), to recover damages on account of Defendants' (i) unlawful failure to pay minimum wage in violation of NYLL §§ 190 *et seq.* and 652 *et seq.*, (ii) unlawful failure to pay premium overtime compensation in violation of NYLL § 650 *et seq.* and 12 N.Y.C.R.R. 142-2.2, (iii) unlawful wage deductions and withholdings under NYLL §§ 193 *et seq.*, (iv) failure to furnish accurate wage statements under NYLL §§ 195 *et seq.* and (v) failure to make wage payments with the requisite frequency under NYLL §§ 191 *et seq.*  These claims are brought as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") and Fed. R. Civ. P. 23.

5.      Plaintiffs also bring this action as an individual and representative action under Internal Revenue Code, 26 U.S.C. §§ 7434 *et seq.* ("IRC") on account of Defendants' willful filing of fraudulent information returns with respect to wages, benefits and wage supplements purportedly paid to and on behalf of Plaintiffs, including but not limited to, group term life

insurance ("GTL") premium payments imputed to employees as taxable income. This claim is brought as a class action pursuant to Fed. R. Civ. P. 23.

6.      Plaintiffs also bring this action as an individual and representative action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1002 *et seq.* ("ERISA"), on account of Defendants' breach of fiduciary obligations including but not limited to the retention of compensation allocated as elective 401(k) plan deferrals (the "Employee Elective Deferrals"), failure to make timely Employee Elective Deferrals into their 401(k) retirement plan (the "401(k) Plan"), retention of compensation allocated for payment of welfare benefit plan premiums, and failure to make timely payment of welfare benefit plan premiums. These claims are brought as a class action pursuant Fed. R. Civ. P. 23.

7.      Lastly, Plaintiffs bring this action as an individual and representative action under New York State common law on account of Defendants' intentional, reckless and/or negligent fraudulent misrepresentations, omissions and promises made regarding the payment of wages, benefits, Employee Elective Deferrals and other wage supplements for employees, as well as Defendants' unjust enrichment and breach of contracts with Plaintiffs and numerous other employees. These claims are brought as a class action pursuant to Article 9 of the CPLR and Fed. R. Civ. P. 23.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has subject matter jurisdiction over this action because this action involves federal questions regarding the deprivation of Plaintiffs' rights under the FLSA, the Internal Revenue Code and ERISA. Pursuant to 28 U.S.C. §§ 1367(a), the Court has supplemental jurisdiction over Plaintiffs' related claims under the NYLL and New York State common law.

9.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because Defendants are doing business in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

10.     Plaintiffs' individual claims, and those of similarly-situated employees, are properly consolidated as a single action because, *inter alia*, their claims arise from the same nexus of facts, parties and circumstances, and involve nearly identical issues of fact and law.

## ADMINISTRATIVE REQUIREMENTS

11.     Pursuant to 26 U.S.C. § 7434(d), Plaintiffs, on behalf of themselves individually and the IRC Class (as defined below), will provide a copy of this Second Amended Complaint to the Internal Revenue Service ("IRS").  A copy of the original Complaint was filed with the IRS on November 15, 2012 and a copy of the First Amended Complaint was filed with the IRS on January 14, 2013.

## PARTIES

12.     Plaintiff Dana Byrne is a resident of the State of New Jersey who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, she was an "employee" within the meaning of all applicable statutes. At all relevant times, she was a "participant" within the meaning of ERISA.

13.     Plaintiff Gale LaCava is a resident of the State of New York who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, she was an "employee" within the meaning of all applicable statutes. At all relevant times, she was a "participant" within the meaning of ERISA.

14.     Plaintiff John Conroy is a resident of the State of New Jersey who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New

York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.
At all relevant times, he was a "participant" within the meaning of ERISA.

  15. Plaintiff Paul Cresti is a resident of the State of New Jersey who worked at
Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New
York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.
At all relevant times, he was a "participant" within the meaning of ERISA.

  16. Plaintiff Derrin Hawkins is a resident of the State of New York who worked at
Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New
York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.
At all relevant times, he was a "participant" within the meaning of ERISA.

  17. Plaintiff Annette Ilagan is a resident of the State of New Jersey who worked at
Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New
York.  At all relevant times, she was an "employee" within the meaning of all applicable statutes.
At all relevant times, she was a "participant" within the meaning of ERISA.

  18. Plaintiff Roger Klein is a resident of the State of New Jersey who worked at
Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New
York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.
At all relevant times, he was a "participant" within the meaning of ERISA.

  19. Plaintiff Vladimir Kvint is a resident of the State of New York who worked at
Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New
York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.
At all relevant times, he was a "participant" within the meaning of ERISA.

20.     Plaintiff Kevin McCausland is a resident of the State of California who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes. At all relevant times, he was a "participant" within the meaning of ERISA.

21.     Plaintiff Brian Meneghin is a resident of the State of New Jersey who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes. At all relevant times, he was a "participant" within the meaning of ERISA.

22.     Plaintiff Steve Mylenski is a resident of the State of New York who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes. At all relevant times, he was a "participant" within the meaning of ERISA.

23.     Plaintiff Jamie Palazzolo is a resident of the State of New York who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes. At all relevant times, he was a "participant" within the meaning of ERISA.

24.     Plaintiff Belinda Park is a resident of the State of New York who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New York.  At all relevant times, she was an "employee" within the meaning of all applicable statutes. At all relevant times, she was a "participant" within the meaning of ERISA.

25.     Plaintiff Sean Roche is a resident of the State of New York who worked at Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New

York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.

At all relevant times, he was a "participant" within the meaning of ERISA.

26.     Plaintiff Sal Tomasiello is a resident of the State of New Jersey who worked at

Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New

York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.

At all relevant times, he was a "participant" within the meaning of ERISA.

27.     Plaintiff Brian Wong is a resident of the State of New Jersey who worked at

Defendants' place of business in the City of New York at 275 Seventh Avenue, New York, New

York.  At all relevant times, he was an "employee" within the meaning of all applicable statutes.

At all relevant times, he was a "participant" within the meaning of ERISA.

28.     RMJM is one of the leading international architectural companies with offices in

Europe, the Middle East, Asia and the United States.  RMJM's services include architectural

design, urban planning, interior design and research and development.  RMJM is currently

engaged in significant projects in over 20 countries worldwide.  Just a few of RMJM's notable

projects include; the Las Colinas Convention Centre in Texas; historic preservations to the U.S.

Capital; the Capital Gate in Abu Dhabi; the Gazprom Headquarters in St. Petersburg; the New

Scottish Parliament in Scotland; and the Falkirk Wheel and Visitor Center in Scotland.

29.     At the relevant times, Defendants have maintained offices throughout the United

States, including but not limited to, in New York City, NY; Princeton, NJ; Philadelphia, PA; and

Washington, DC.

30.     Defendant RMJM, Inc. is a foreign corporation with its primary place of business

reportedly located in Princeton, New Jersey.  At all relevant times, RMJM, Inc. was and remains

doing business within the State of New York and was and remains an "employer" within the

meaning of all applicable statutes.  At all relevant times, RMJM, Inc. was and remains a "fiduciary" within the meaning of ERISA.

31.    Defendant RMJM Group, Inc. is a foreign corporation with its primary place of business reportedly located in Princeton, New Jersey.  At all relevant times, RMJM Group, Inc. was and remains doing business within the State of New York and was and remains an "employer" within the meaning of all applicable statutes.  At all relevant times, RMJM Group, Inc. was and remains a "fiduciary" within the meaning of ERISA.

32.    Defendant RMJM Hillier Group, Inc. is a foreign corporation with its primary place of business reportedly located in Princeton, New Jersey.  At all relevant times, RMJM Hillier Group, Inc. was and remains doing business within the State of New York and was and remains an "employer" within the meaning of all applicable statutes.  At all relevant times, RMJM Hillier Group, Inc. was and remains a "fiduciary" within the meaning of ERISA.

33.    Defendant RMJM Hillier Worldwide, Inc. is a foreign corporation with its primary place of business reportedly located in Princeton, New Jersey.  At all relevant times, RMJM Hillier Worldwide, Inc. was and remains doing business within the State of New York and was and remains an "employer" within the meaning of all applicable statutes. At all relevant times, RMJM Hillier Worldwide, Inc. was and remains a "fiduciary" within the meaning of ERISA.

34.    Defendant RMJM Worldwide, Inc. is a foreign corporation with its primary place of business reportedly located in Princeton, New Jersey.  At all relevant times, RMJM Worldwide, Inc. was and remains doing business within the State of New York and was and remains an "employer" within the meaning of all applicable statutes.  At all relevant times, RMJM Worldwide, Inc. was a and remains "fiduciary" within the meaning of ERISA.

35.     Defendant Richard Bailes was a Managing Director of RMJM's New York office, and is currently employed by RMJM in London, England.  Defendant Bailes controls the operations of RMJM and determines the policies and practices of RMJM including, but not limited to, how employees are compensated.  At all relevant times, Defendant Bailes was and remains an "employer" within the meaning of all applicable statutes.  At all relevant times, Defendant Bailes was and remains a "fiduciary" within the meaning of ERISA.

36.     Defendant Declan Thompson is the Commercial Director of RMJM.  Defendant Thompson controls the operations of RMJM and determines the policies and practices of RMJM including, but not limited to, how employees are compensated.  At all relevant times, Defendant Thompson was and remains an "employer" within the meaning of all applicable statutes.  At all relevant times, Defendant Thompson was and remains a "fiduciary" within the meaning of ERISA.

37.     Defendant Fraser Morrison is the Chairman and majority shareholder of Defendant RMJM.  Defendant Fraser Morrison controlled the operations of RMJM and determined the policies and practices of RMJM including, but not limited to, how employees were compensated.  At all relevant times, Defendant Fraser Morrison was and remains an "employer" within the meaning of all applicable statutes.  At all relevant times, Defendant Fraser Morrison was and remains a "fiduciary" within the meaning of ERISA.

38.     Defendant Peter Morrison is the Chief Executive Officer of RMJM.  Defendant Peter Morrison controls the operations of RMJM and determines the policies and practices of RMJM including, but not limited to, how employees are compensated.  At all relevant times, Defendant Peter Morrison was and remains an "employer" within the meaning of all applicable

statutes.  At all relevant times, Defendant Peter Morrison was and remains a "fiduciary" within the meaning of ERISA.

39.     The Individual Defendants were Plaintiffs' "employers" because, *inter alia*, they each collectively and individually (i) owned and operated RMJM, (ii) controlled RMJM's work and wage payment conditions and methods including the conditions described here, (iii) had the power and authority to hire and fire employees including but not limited to Plaintiffs, and (iv) had budgetary authority over RMJM.

40.     At all relevant times, RMJM was a single business enterprise and jointly employed Plaintiffs, the FLSA Collective, the NYLL Class, the IRC Class, the ERISA Class and the New York Common Law Class.  Defendants were joint employers of Plaintiffs, the FLSA Collective, the NYLL Class, the IRC Class, the ERISA Class and the New York Common Law Class.  Defendants' employees were subjected to the same conduct, policies and practices as described herein.

41.     At all relevant times, Defendants were and remain an "employer" within the meaning of all applicable statutes, an enterprise engaged in commerce, as defined by §203(r) and (s) of the FLSA, with annual gross volume of sales made or business done in an amount not less than $500,000, a "person" within the meaning of 26 U.S.C. § 7434 and a fiduciary within the meaning of ERISA.

## FLSA COLLECTIVE ACTION ALLEGATIONS

42.     Plaintiffs bring their FLSA claims as a collective action pursuant to Section 216(b) of the FLSA on behalf of themselves individually and on behalf of all other similarly-situated employees who were/are employed by Defendants and were/are not paid the prevailing

minimum wage for all hours worked and were/are not paid premium overtime compensation for all hours worked in excess of 40 hours per week (the "FLSA Collective").

43.     The members of the FLSA Collective were/are paid in the same manner and under the same common policies, plans and practices as Plaintiffs described herein.

44.     The FLSA Collective, like Plaintiffs, have been and are subjected to the same unlawful policies, plans and practices described herein, including failure to pay the prevailing minimum wage for all hours worked and failure to pay premium overtime compensation for all hours worked in excess of 40 hours per week.

45.     Defendants were/are fully aware that Plaintiffs and the FLSA Collective were not exempt from the minimum wage or overtime provisions of the FLSA, because *inter alia*, Defendants were/are aware that Plaintiffs and the FLSA Collective were/are not paid on a "salary basis."

46.     As a result of Defendants' conduct as alleged herein, Defendants violated the FLSA by not paying Plaintiffs and the members of the FLSA Collective the prevailing minimum wage for all hours worked and premium overtime compensation for all hours worked in excess of 40 hours per week.

47.     Defendants' violations of the aforementioned statutes were willful, repeated, knowing, intentional and without a good faith basis, and significantly damaged Plaintiffs and the members of the FLSA Collective.

48.     As a result of Defendants' conduct, Defendants are liable to Plaintiffs and the FLSA Collective for the full amount of their unpaid minimum wages, plus an additional equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiffs and the FLSA Collective.

49.     As a result of Defendants' conduct, Defendants are liable to Plaintiffs and the FLSA Collective for the full amount of unpaid premium overtime compensation, plus an additional equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiffs and the FLSA Collective.

50.     While the exact number of the FLSA Collective is unknown to Plaintiffs at the present time, upon information and belief, there are at least 100 other similarly-situated persons who were/are employed by Defendants in the United States during the relevant period.

51.     Plaintiffs are currently unaware of the identities of all the members of the FLSA Collective.  Accordingly, Defendants should be required to provide Plaintiffs with a list of all similarly situated persons employed by Defendants in the United States who were not paid the minimum wage for all hours worked and not paid premium overtime compensation for all hours worked in excess of 40 hours per week, along with their last known addresses, telephone numbers and e-mail addresses so Plaintiffs can give the members of the FLSA Collective notice of this action and an opportunity to make an informed decision about whether to participate in it.

## RULE 23 CLASS ACTION ALLEGATIONS

**I.      New York Labor Law Class**

52.     Plaintiffs bring their New York Labor Law claims as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves individually and on behalf of all persons employed by Defendants within the State of New York who were subjected to Defendants' (i) unlawful failure to pay minimum wage in violation of NYLL §§ 190 *et seq.*, (ii) unlawful failure to pay premium overtime compensation for all hours worked in excess of 40 hours per week in violation of NYLL §§ 650 *et seq.* and 12 N.Y.C.R.R. 142-2.2, (iii) unlawful wage deductions and withholdings under NYLL §§ 193 *et seq.*, (iv) failure to furnish accurate wage statements under

13

NYLL §§ 195, *et seq.* and (v) failure to make wage payments with the requisite frequency under NYLL §§ 191 *et seq.* (the "NYLL Class").

53.     The NYLL Class, like Plaintiffs, was/are subjected to Defendants' unlawful failure to pay minimum wage, unlawful failure to pay premium overtime compensation, unlawful withholding of wages, unlawful wage deductions and withholdings, failure to furnish accurate wage statements, and failure to make wage payments with the requisite frequency.

54.     The members of the NYLL Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the size of the NYLL Class is more than 75 individuals.

55.     The claims of Plaintiffs described herein are typical of the claims of the NYLL Class they seek to represent.

56.     Plaintiffs will fairy and adequately represent and protect the interests of the NYLL Class and have retained counsel competent and experienced in complex class actions and employment litigation.

57.     Common questions of law and fact exist as to the NYLL Class and predominate over any questions affecting only individual members of the NYLL Class, which include, but are not limited to, the following:

  (a)  Whether Defendants employed Plaintiffs and the NYLL Class within the meaning of the NYLL;

  (b)  Whether Defendants failed to pay Plaintiffs and the NYLL Class the minimum wage for all hours worked;

  (c)  Whether Defendants failed to pay premium overtime compensation for all hours worked in excess of 40 hours per week;

(d)     Whether Defendants failed to pay Plaintiffs and the NYLL Class their wages for all hours worked as required by the NYLL;

(e)     Whether Defendants made unlawful deductions from wage payments to Plaintiffs and the NYLL Class;

(f)     Whether Defendants failed to furnish accurate wage statements to Plaintiffs and the NYLL Class as required by the NYLL;

(g)     Whether Defendants failed to make wage payments with the requisite frequency to Plaintiffs and the NYLL Class; and,

(h)     Whether Defendants' violations of the NYLL were willful.

58.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the NYLL Class.  There will be no difficulty in the management of this action as a class action.  The cost of proving Defendants' violations of the NYLL makes it impracticable for Plaintiffs and the NYLL Class to pursue their claims individually.  Maintenance of a class action promotes judicial economy by consolidating a large class of plaintiffs litigating identical claims.  The claims of the NYLL Class interrelate such that the interests of the members will be fairly and adequately protected in their absence.

## II.     Internal Revenue Code Class

59.     Plaintiffs bring their Internal Revenue Code claims as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves individually and on behalf of all persons employed by Defendants who were subjected to Defendants' unlawful filing of fraudulent information returns with the Internal Revenue Service; namely, by falsely reporting that Defendants paid wages, benefits and/or wage supplements to and on behalf of their employees, including but not limited to, GTL premiums, a portion of which was imputed to employees as taxable income (the "IRC Class").

60.     The members of the IRC Class, like Plaintiffs, were/are subjected to Defendants' unlawful filing of fraudulent information returns with the Internal Revenue Service.

61.     The members of the IRC Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the size of the IRC Class is more than 75 individuals.

62.     The claims of Plaintiffs described herein are typical of the claims of the IRC Class they seek to represent.

63.     Plaintiffs will fairly and adequately represent and protect the interests of the IRC Class and have retained counsel competent and experienced in complex class actions and employment litigation.

64.     Common questions of law and fact exist as to the IRC Class, and predominate over any questions affecting only individual members of the IRC Class, which include, but are not limited to, the following:

    (a)     Whether Defendants filed fraudulent information returns with the IRS as to Plaintiffs and the IRC Class;

    (b)     Whether Defendants reported that Plaintiffs and the IRC Class received taxable income on account of unpaid GTL premium payments;

    (c)     Whether Defendants reported that Plaintiffs and the IRC Class were provided wages, benefits, and Employee Elective Deferrals which were not actually provided;

    (d)     Whether taxable income was imputed to Plaintiffs and the IRC Class for unpaid GTL premiums;

    (e)     Whether Plaintiffs and the IRC Class suffered increased tax liability on account of Defendants' filing of false information returns; and,

    (f)     Whether Defendants' violations of the Internal Revenue Code were willful.

65.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the IRC Class.  There will be no difficulty in the management of this action as a class action.  The cost of proving Defendants' violations of the Internal Revenue Code makes it impracticable for Plaintiffs and the IRC Class to pursue their claims individually.  Maintenance of a class action promotes judicial economy by consolidating a large class of plaintiffs litigating identical claims.  The claims of the IRC Class interrelate such that the interests of the members will be fairly and adequately protected in their absence.

**III.    ERISA Class**

66.     Plaintiffs bring their ERISA claims as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves individually and on behalf of all persons employed by Defendants in the United States who were subjected to Defendants' breach of fiduciary obligations under ERISA including but not limited to retention of compensation allocated as Employee Elective Deferrals, failure to make timely Employee Elective Deferrals into the 401(k) Plan, retention of compensation allocated for payment of welfare benefit plan premiums, and failure to make timely payment of welfare benefit plan premiums (the "ERISA Class").

67.     The ERISA Class, like Plaintiffs, was/are subjected to Defendants' retention of compensation allocated as Employee Elective Deferrals, failure to make timely Employee Elective Deferrals into the 401(k) Plan, retention of compensation allocated for payment of welfare benefit plan premiums, and failure to make timely payment of welfare benefit plan premiums.

68.     The members of the ERISA Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the size of the ERISA Class is more than 100 individuals.

69.     The claims of Plaintiffs are typical of the claims of the ERISA Class they seek to represent.

70.     Plaintiffs will fairly and adequately represent and protect the interests of the ERISA Class and have retained counsel competent and experienced in complex class actions and employment litigation.

71.     Common questions of law and fact exist as to the ERISA Class, and predominate over any questions affecting only individual members of the ERISA Class, which include, but are not limited to, the following:

(a)     Whether Defendants retained compensation which had been allocated by Plaintiffs and the ERISA Class as Employee Elective Deferrals;

(b)     Whether Defendants failed to make timely Employee Elective Deferrals into Plaintiffs and the members of the ERISA Class' 401(k) plans;

(c)     Whether Defendants retained compensation allocated for payment of Plaintiffs and the members of the ERISA Class' welfare benefit plan premiums; and,

(d)     Whether Defendants failed to make timely payment of welfare benefit plan premiums of Plaintiffs and the members of the ERISA Class.

72.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the ERISA Class.  There will be no difficulty in the management of this action as a class action.  The cost of proving Defendants' violations of the ERISA makes it impracticable for Plaintiffs and the ERISA Class to pursue their claims individually.  Maintenance of a class action promotes judicial economy by consolidating a large class of plaintiffs litigating identical claims.  The claims of the ERISA Class interrelate such that the interests of the members will be fairly and adequately protected in their absence.

IV.   **New York Common Law Class**

73.     Plaintiffs bring their New York State common law claims as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and on behalf of all persons employed by Defendants within the State of New York who were subjected to Defendants' contract breaches and intentional, reckless and/or negligent conduct with regard to fraudulent misrepresentations, omissions and/or promises regarding the payment of benefit wages, benefits and Employee Elective Deferrals, and the status of Plaintiffs' benefit plans and 401(k) Plan (the "New York Common Law Class").

74.     The members of the New York Common Law Class, like Plaintiffs, were/are subjected to Defendants' breach of contracts and intentional, reckless and/or negligent conduct with regard to fraudulent misrepresentations, omissions and/or promises as described herein.

75.     The members of the New York Common Law Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the size of the New York Common Law Class is more than 75 individuals.

76.     The claims of Plaintiffs are typical of the claims of the New York Common Law Class they seek to represent.

77.     Plaintiffs will fairly and adequately represent and protect the interests of the New York Common Law Class and has retained counsel competent and experienced in complex class actions and employment litigation.

78.     Common questions of law and fact exist as to the New York Common Law Class, and predominate over any questions affecting only individual members of the New York Common Law Class, which include, but are not limited to, the following:

(a)     Whether Defendants have made and/or are making misrepresentations to Plaintiffs and the New York

Common Law Class with respect to payment of wages, wage supplements, including severance and benefit premiums for GTL and health and dental insurance, as well as with respect to the cancellation of the GTL, health and dental policies and the payment of Employee Elective Deferrals;

(b)   Whether Defendants have made and/or are making a clear and unambiguous promise to Plaintiffs and the New York Common Law Class to pay wages, wage supplements, including severance and benefit premiums for GTL and health and dental insurance, and the payment of Employee Elective Deferrals;

(c)   Whether Defendants have failed and/or are failing to discharge a duty to disclose to Plaintiffs and the New York Common Law Class that Employee Elective Deferrals and benefit premiums were/are not being paid, and that the benefit policies have been and/or were cancelled;

(d)   Whether Defendants continued to make misrepresentations as to the payment of Employee Elective Deferrals and benefit premiums even while they were not being paid;

(e)   Whether Defendants have made and/or are making misrepresentations of material fact;

(f)   Whether Defendants' misrepresentations as to the payment wages, wage supplements, including severance and benefit premiums for GTL and health and dental insurance, and the payment of Employee Elective Deferrals have been made and/or are being made with scienter;

(g)   Whether Defendants' misrepresentations have been made and/or are being made for the purpose of inducing Plaintiffs and the New York Common Law Class to rely on them;

(h)   Whether Plaintiffs and the New York Common Law Class have reasonably and justifiably relied and/or are reasonably and justifiably relying on Defendants' misrepresentations;

(i)   Whether Plaintiffs and the New York Common Law Class have relied and/or are relying on Defendants' promises;

(j)   Whether it was reasonable and foreseeable to Defendants that Plaintiffs and the New York Common Law Class

would rely on Defendants' promises and misrepresentations;

(k)     Whether Plaintiffs and the New York Common Law Class have entered into enforceable contracts with Defendants under which Defendants agreed to and were obligated to pay to Plaintiffs and/or make payments on behalf of Plaintiffs and the New York Common Law Class' with respect to wages, wage supplements, including severance and benefit premiums for GTL and health and dental insurance, and Employee Elective Deferrals;

(l)     Whether Defendants have breached and/or are breaching their contracts with Plaintiffs and the New York Common Law Class by failing to make said payments;

(m)    Whether Plaintiffs and the New York Common Law Class suffered damages as a result of Defendants' tortious conduct and breach of contract; and,

(n)     Whether Defendants' tortious conduct was willful, intentional and made with a criminal-like indifference to the rights of Plaintiffs and the New York Common Law Class.

79.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the New York Common Law Class. There will be no difficulty in the management of this action as a class action. The cost of proving Defendants' violations of New York law makes it impracticable for Plaintiffs and the New York Common Law Class to pursue their claims individually. Maintenance of a class action promotes judicial economy by consolidating a large class of plaintiffs litigating identical claims. The claims of the New York Common Law Class interrelate such that the interests of the members will be fairly and adequately protected in their absence.

## FACTUAL ALLEGATIONS

### I.   Plaintiff Dana Byrne

80.   Plaintiff Dana Byrne was employed by Defendants from on or about September 2, 2008 through on or about December 21, 2011, as a Human Resources Manager and was involved in, *inter alia*, talent acquisition and development.

Breach of Contract[1]

81.   Defendants offered Ms. Byrne employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for her work and services.

82.   Ms. Byrne accepted Defendants' offer and entered into an enforceable contract with Defendants whereby she agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate her with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

83.   There was a meeting of the minds between Ms. Byrne and Defendants with regard to the material terms of the contract.

84.   Ms. Byrne performed all her contractual obligations, while Defendants did not perform all of their contractual obligations.

85.   Specifically, Defendants breached the contract with Ms. Byrne by, *inter alia*, failing to compensate Ms. Byrne with all of her wages, benefits, including but not limited to, GTL premium payments and accrued paid vacation.

---

[1]   These subheadings are intended to aid in the construction of the Complaint, given the scope and expansiveness of Defendants' unlawful conduct. However, allegations under any particular sub-heading may be applicable to other sub-headings as well.

86.     Ms. Byrne was simply not paid any compensation and benefits for certain portions of her employment.

Defendants' Tortious Conduct

87.     In or around mid-2011, Defendants stopped paying Ms. Byrne's GTL premiums.

88.     On or about September 1, 2011, the GTL policy was cancelled for non-payment.

89.     However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Ms. Byrne.

90.     Despite the fact that Defendants ceased payment of Ms. Byrne's GTL premiums, Defendants continued to provide Ms. Byrne with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

91.     Specifically, but only by way of example, Ms. Byrne's wage statements throughout 2011 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

92.     Furthermore, throughout Ms. Byrne's employment, Defendants made numerous misrepresentations and/or promises that Ms. Byrne would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

93.     Defendants intentionally and affirmatively misrepresented to Ms. Byrne that GTL premiums would be and were being paid and that the GTL policy was active.

94.     Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Ms. Byrne.

95.     Defendants did not notify Ms. Byrne about the cancellation of the GTL policy.

96.     As a result, Ms. Byrne was unable to convert her GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

97.     Ms. Byrne reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

98.     Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Ms. Byrne would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

99.     Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Ms. Byrne continued to be assessed with taxable income for GTL premium payments.

100.    Defendants willfully filed fraudulent information returns with respect to GTL premium payments purported to be made for Ms. Byrne.

101.    These information returns falsely stated that taxable income was received by Ms. Byrne in the form of GTL premium payments, which were never actually paid.

As a result, Ms. Byrne suffered increased tax liability.

ERISA Violations

102.    Defendants failed to promptly pay premiums for Ms. Byrne's GTL as required by law and under the terms of the respective benefit plans.

103.    As a result, Ms. Byrne suffered from lapses in coverage and ultimately termination of such benefits.

FLSA and NYLL Violations

104.    During Ms. Byrne's employment, Defendants often failed to make timely wage payments.

105.    Defendants' untimely wage payments to Ms. Byrne were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

106.    Defendants often made wage payments to Ms. Byrne several days, weeks or even months late.

107.    Ms. Byrne did not consent to these late, untimely wage payments.

108.    To the contrary, Ms. Byrne complained about Defendants' repeated failure to make payroll in a timely fashion.

109.    Though Ms. Byrne's wage payments were issued late, Defendants still provided her with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

110.    Defendants provided Ms. Byrne with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums.

111.    In late 2011, Ms. Byrne separated from employment and her separation from employment became effective on or about December 21, 2011.

112.    On Ms. Byrne's effective separation date, Defendants owed her, *inter alia*, earned wages for work she had already performed, payment for accrued but unused vacation time and reimbursement of expenses.

113.    Defendants failed to pay Ms. Byrne's remaining wages due in the next regular pay period following the separation of her employment.

114.    To date, Defendants have failed to pay Ms. Byrne all wages and other agreed upon compensation due.

115.    Defendants made unlawful deductions from Ms. Byrne's wages for supposed benefits and wage supplements which were never actually paid, including but not limited to, GTL premiums.

116.    Defendants also made unlawful deductions from Ms. Byrne's wages by retaining and simply not paying Ms. Byrne's wages for periods of time.

117.    For the periods of time for which Defendants provided Ms. Byrne with no wage payments, Ms. Byrne was denied minimum wage.

## II.   **Plaintiff Gale LaCava**

118.    Plaintiff Gale LaCava was employed by Defendants from on or about May 28, 2008 through August 3, 2012, most recently as a Marketing Principal.

Breach of Contract

119.    Defendants offered Ms. LaCava employment and compensation including but not limited to wages, benefits, and wage supplements, in exchange for her work and services.

120.    Ms. LaCava accepted Defendants' offer and entered into an enforceable contract with Defendants whereby she agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate her with, *inter alia*, wages, benefits and wage supplements.

121.    Thus, there was a meeting of the minds between Ms. LaCava and Defendants with regard to the material terms of the contract.

122.    Ms. LaCava performed all her contractual obligations, while Defendants did not perform all of their contractual obligations.

123.    Specifically, Defendants breached the contract with Ms. LaCava by, *inter alia*, failing to compensate Ms. LaCava with all of her wages, benefits and wage supplements, including but not limited to, severance, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.

124.    Ms. LaCava was simply not paid any compensation, benefits and wage supplements for certain portions of her employment.

Defendants' Tortious Conduct

125.    In or around mid-2011, Defendants stopped paying Ms. LaCava's GTL premiums.

126.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

127.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy were concealed from Ms. LaCava.

128.    Despite the fact that Defendants ceased payment of Ms. LaCava's GTL premiums, Defendants continued to provide Ms. LaCava with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

129.    Specifically, but only by way of example, Ms. LaCava's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

130.    Furthermore, throughout Ms. LaCava's employment, Defendants made numerous misrepresentations and/or promises that Ms. LaCava would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

131.    Defendants intentionally and affirmatively misrepresented to Ms. LaCava that GTL premiums would be and were being paid and that the GTL policy was active.

132.     Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Ms. LaCava.

133.     Defendants did not notify Ms. LaCava about the cancellation of the GTL policy.

134.     As a result, Ms. LaCava was unable to convert her GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

135.     Ms. LaCava reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

136.     Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Ms. LaCava would rely upon these misrepresentations, omissions and/or promises.

137.     Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Ms. LaCava's health and dental insurance.  As a result, Ms. LaCava's health and dental insurance plans were cancelled in or around December 2011.  The plans were not reinstated until in or around January 2012.

138.     However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Ms. LaCava.

139.     Despite the fact that Defendants ceased payment of Ms. LaCava's health and dental insurance premiums from in or around September 2011 to January 2012, Defendants continued to deduct monies from Ms. LaCava's pay for health and dental insurance premiums. Ms. LaCava's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

140.     Furthermore, throughout Ms. LaCava's employment, Defendants made numerous misrepresentations and/or promises that Ms. LaCava would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

141.     Defendants intentionally and affirmatively misrepresented to Ms. LaCava that health and dental insurance premiums would be and were being paid and that the health and dental insurance policies were active at all times.

142.     Defendants intentionally concealed the non-payment of health and dental insurance premiums and the cancellation of the health and dental insurance policies from Ms. LaCava.

143.     Defendants did not notify Ms. LaCava about the cancellation of the health and dental insurance policies.

144.    As a result, deductions were made from Ms. LaCava's pay under fraudulent pretenses, and Ms. LaCava was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from her pay to pay for same.

145.    Ms. LaCava reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

146.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Ms. LaCava would rely upon these misrepresentations, omissions and/or promises.

147.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

148.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Ms. LaCava.

149.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Ms. LaCava, Defendants continued to deduct monies from Ms. LaCava's pay for the payment of Employee Elective Deferrals.  Ms. LaCava's wage statements during this time reflected these "deductions" for purported "401 K $" payments.  These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

150.     Furthermore, throughout Ms. LaCava's employment, Defendants made numerous misrepresentations and/or promises that Ms. LaCava would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

151.     Defendants intentionally and affirmatively misrepresented to Ms. LaCava that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

152.     Defendants intentionally concealed the late payment of Employee Elective Deferrals from Ms. LaCava.

153.     Defendants did not notify Ms. LaCava about the late payment of Employee Elective Deferrals.

154.     As a result, deductions were made from Ms. LaCava's pay under fraudulent pretenses, and Ms. LaCava was not provided with the investments, investment opportunities, interest and other benefits that she would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from her pay to pay for same.

155.     Ms. LaCava reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

156.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Ms. LaCava would rely upon these misrepresentations, omissions and/or promises.

157.    One of the agreed upon terms of Defendants' contract with Ms. LaCava is that she would be paid six months of severance in the event her employment with RMJM was involuntarily separated.  In early 2012, Ms. LaCava was told by Defendants' Human Resources personnel that Defendants reduced this offer to two months of severance.  Defendants terminated Ms. LaCava in or around August 2012, and did not make any severance payment to her.

158.    Ms. LaCava reasonably and justifiably relied on the original and agreed upon six month severance, as well as the representation that she would be entitled to two months' severance in the event she was terminated by , *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

159.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Ms. LaCava would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

160.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Ms. LaCava continued to be assessed with taxable income for GTL premium payments.

161.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Ms. LaCava.

162.     These information returns falsely stated that taxable income was received by Ms. LaCava, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

163.     Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Ms. LaCava's wages to pay for benefit premiums, including health and dental insurance premiums, and 401(k) Employee Elective Deferrals.

164.     In fact, compensation allocated by Ms. LaCava for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

165.     As a result of the filing of fraudulent information returns, Ms. LaCava suffered increased tax liability.

ERISA Violations

166.     Ms. LaCava elected to participate in the 401(k) Plan and make Employee Elective Deferrals from her compensation.

167.     Defendants failed to deposit Ms. LaCava's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

168.     Defendants retained the funds Ms. LaCava allocated as Employee Elective Deferrals, rather than simply paying it to her as compensation.

169.     Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Ms. LaCava as Employee Elective Deferrals for the 401(k) Plan.

170.     As a result, Ms. LaCava was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

171.    Moreover, Defendants failed to promptly pay premiums for Ms. LaCava's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

172.    As a result, Ms. LaCava suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

173.    During Ms. LaCava's employment, Defendants often failed to make timely wage payments.

174.    Defendants' untimely wage payments to Ms. LaCava were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

175.    Defendants often made wage payments to Ms. LaCava several days, weeks or even months late.

176.    Ms. LaCava did not consent to these late, untimely wage payments.

177.    To the contrary, Ms. LaCava complained about Defendants' repeated failure to make payroll in a timely fashion.

178.    Though Ms. LaCava's wage payments were issued late, Defendants still provided her with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

179.    Defendants provided Ms. LaCava with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL

premiums, health insurance premiums, dental insurance premiums and Employee Elective Deferral payments.

180. On or about August 3, 2012, Ms. LaCava separated from employment with Defendants.

181. On Ms. LaCava's separation date, Defendants owed her, *inter alia*, earned wages for work she had already performed, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

182. Defendants failed to pay Ms. LaCava's remaining wages due in the next regular pay period following the separation of her employment.

183. To date, Defendants have failed to pay Ms. LaCava all wages and other agreed upon compensation due.

184. Defendants made unlawful deductions from Ms. LaCava's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, (iv) 401(k) Employee Elective Deferrals; and (v) severance.

185. Defendants also made unlawful deductions from Ms. LaCava's wages by retaining and simply not paying Ms. LaCava's wages for periods of time.

186. For the periods of time for which Defendants provided Ms. LaCava with no wage payments, Ms. LaCava was denied minimum wage.

187. Moreover, Ms. LaCava often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours she worked in excess of 40 hours.

III.    **Plaintiff John Conroy**

188.    John Conroy was employed by Defendants from 1990 through January 9, 2012, most recently as a Senior Associate.

Breach of Contract

189.    Defendants offered Mr. Conroy employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

190.    Mr. Conroy accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

191.    Thus, there was a meeting of the minds between Mr. Conroy and Defendants with regard to the material terms of the contract.

192.    Mr. Conroy performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

193.    Specifically, Defendants breached the contract with Mr. Conroy by, *inter alia*, failing to compensate Mr. Conroy with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, severance, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.

194.    Defendants further breached the contract with Mr. Conroy by refusing to provide him with an agreed upon retention bonus.

195.     Mr. Conroy was simply not paid any compensation, benefits, accrued paid

vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

196.     More specifically, in or around mid-2011, Defendants stopped paying Mr.

Conroy's GTL premiums.

197.     On or about September 1, 2011, the GTL policy was cancelled for non-payment.

198.     However, Defendants' nonpayment of GTL premiums and cancellation of the

policy were concealed from Mr. Conroy.

199.     Despite the fact that Defendants ceased payment of Mr. Conroy's GTL premiums,

Defendants continued to provide Mr. Conroy with wage statements which misrepresented that

Defendants were continuing to pay premiums for the GTL policy.

200.     Specifically, but only by way of example, Mr. Conroy's wage statements

throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed

taxable income under the "Other Benefits and Information" section.

201.     Furthermore, throughout Mr. Conroy's employment, Defendants made numerous

misrepresentations and/or promises that Mr. Conroy would be compensated, in part, by

Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but

was not limited to, statements in company handbooks and policy documents which stated that

Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of

$300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to

you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the

Company will appear as taxable income to the employee based on age and amount of coverage

provided during the year."

202.    Defendants intentionally and affirmatively misrepresented to Mr. Conroy that GTL premiums would be and were being paid and that the GTL policy was active.

203.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Conroy.

204.    Defendants did not notify Mr. Conroy about the cancellation of the GTL policy.

205.    As a result, Mr. Conroy was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

206.    Mr. Conroy reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

207.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Conroy would rely upon these misrepresentations, omissions and/or promises.

208.    Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Conroy's health and dental insurance.  As a result, Mr. Conroy's health and dental insurance plans were cancelled in or around December 2011.  The plans were not reinstated until in or around January 2012.

209.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Conroy.

210.    Despite the fact that Defendants ceased payment of Mr. Conroy's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Conroy's pay for health and dental insurance premiums.  Mr. Conroy's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums. These representations were false and/or misleading, as premium payments were not being made during this time.

211.    Furthermore, throughout Mr. Conroy's employment, Defendants made numerous misrepresentations and/or promises that Mr. Conroy would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

212.    Defendants intentionally and affirmatively misrepresented to Mr. Conroy that health and dental insurance premiums would be and were being paid.

213.    Defendants intentionally concealed the non-payment of health and dental insurance premiums from Mr. Conroy.

214.    As a result, deductions were made from Mr. Conroy's pay under fraudulent pretenses, and Mr. Conroy was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

215.    Mr. Conroy reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

216.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. Conroy would rely upon these misrepresentations, omissions and/or promises.

217.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

218.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. Conroy.

219.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. Conroy, Defendants continued to deduct monies from Mr. Conroy's pay for the payment of Employee Elective Deferrals.  Mr. Conroy's wage statements during this time reflected these "deductions" for purported "401K $" payments.  These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

220.    Furthermore, throughout Mr. Conroy's employment, Defendants made numerous misrepresentations and/or promises that Mr. Conroy would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or

promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

221.    Defendants intentionally and affirmatively misrepresented to Mr. Conroy that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

222.    Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Conroy.

223.    Defendants did not notify Mr. Conroy about the late payment of Employee Elective Deferrals.

224.    As a result, deductions were made from Mr. Conroy's pay under fraudulent pretenses, and Mr. Conroy was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

225.    Mr. Conroy reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

226.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related

matters, and that Mr. Conroy would rely upon these misrepresentations, omissions and/or promises.

227.    One of the agreed upon terms of Defendants' contract with Mr. Conroy is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."  Pursuant to this agreement, Mr. Conroy was entitled to 17 days of severance based on his approximately 21 years of service to RMJM.  Moreover, in or around January 2012, Mr. Conroy was laid off by RMJM.  Despite being promised that he would be paid "the severance and vacation benefits owed to [him]," and Defendant Bailes specifically stated that Mr. Conroy was owed $10,000 in severance, Mr. Conroy never received any severance.

228.    Mr. Conroy reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

229.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Conroy would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

230.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Conroy continued to be assessed with taxable income for GTL premium payments.

231.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Conroy.

232.    These information returns falsely stated that taxable income was received by Mr. Conroy, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

233.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Conroy's wages to pay for benefit premiums, including health and dental insurance premiums, and 401(k) Employee Elective Deferrals.

234.    In fact, compensation allocated by Mr. Conroy for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

235.    As a result of the filing of fraudulent information returns, Mr. Conroy suffered increased tax liability.

ERISA Violations

236.    Mr. Conroy elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

237.    Defendants failed to deposit Mr. Conroy's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

238.    Defendants retained the funds Mr. Conroy allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

239.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. Conroy as Employee Elective Deferrals for the 401(k) Plan.

240.    As a result, Mr. Conroy was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

241.    Moreover, Defendants failed to promptly pay premiums for Mr. Conroy's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

242.    As a result, Mr. Conroy suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

243.    During Mr. Conroy's employment, Defendants often failed to make timely wage payments.

244.    Defendants' untimely wage payments to Mr. Conroy were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

245.    Defendants often made wage payments to Mr. Conroy several days, weeks or even months late.

246.    Mr. Conroy did not consent to these late, untimely wage payments.

247.    To the contrary, Mr. Conroy repeatedly complained about Defendants' repeated failure to make payroll in a timely fashion.  These complaints started in 2008 and continued throughout the remainder of his employment.

248.    Though Mr. Conroy's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

249.    Defendants provided Mr. Conroy with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health insurance premiums, dental insurance premiums and Employee Elective Deferrals.

250.    On or about January 9, 2012, Mr. Conroy separated from employment with Defendants.

251.    On Mr. Conroy's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, unpaid expenses, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

252.    Defendants failed to pay Mr. Conroy's remaining wages due in the next regular pay period following the separation of his employment.

253.    To date, Defendants have failed to pay Mr. Conroy all wages and other agreed upon compensation due.

254.    Defendants made unlawful deductions from Mr. Conroy's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, (iv) Employee Elective Deferrals; and (v) severance.

255.    Defendants also made unlawful deductions from Mr. Conroy's wages by retaining and simply not paying Mr. Conroy's wages for periods of time.

256.    For the periods of time for which Defendants provided Mr. Conroy with no wage payments, Mr. Conroy was denied minimum wage.

257.    Moreover, Mr. Conroy often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## IV.    Plaintiff Paul Cresti

258.    Paul Cresti was employed by Defendants from in or around September 2008 through January 2012, most recently as a Senior Associate.

Breach of Contract

259.    Defendants offered Mr. Cresti employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

260.    Mr. Cresti accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

261.    Thus, there was a meeting of the minds between Mr. Cresti and Defendants with regard to the material terms of the contract.

262.    Mr. Cresti performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

263.    Specifically, Defendants breached the contract with Mr. Cresti by, *inter alia*, failing to compensate Mr. Cresti with all of his wages, benefits, accrued paid vacation, and wage

supplements, including but not limited to, severance, the payment of benefit premiums, including

those for GTL, dental and health insurance policies, and the payment of Employee Elective

Deferrals.

264.   Defendants further breached the contract with Mr. Cresti by refusing to provide

him with an agreed upon retention bonus.

265.   Mr. Cresti was simply not paid any compensation, benefits, accrued paid vacation

and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

266.   More specifically, in or around mid-2011, Defendants stopped paying Mr.

Cresti's GTL premiums.

267.   On or about September 1, 2011, the GTL policy was cancelled for non-payment.

268.   However, Defendants' nonpayment of GTL premiums and cancellation of the

policy was concealed from Mr. Cresti.

269.   Despite the fact that Defendants ceased payment of Mr. Cresti's GTL premiums,

Defendants continued to provide Mr. Cresti with wage statements which misrepresented that

Defendants were continuing to pay premiums for the GTL policy.

270.   Specifically, but only by way of example, Mr. Cresti's wage statements

throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed

taxable income under the "Other Benefits and Information" section.

271.   Furthermore, throughout Mr. Cresti's employment, Defendants made numerous

misrepresentations and/or promises that Mr. Cresti would be compensated, in part, by

Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but

was not limited to, statements in company handbooks and policy documents which stated that

Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

272.   Defendants intentionally and affirmatively misrepresented to Mr. Cresti that GTL premiums would be and were being paid and that the GTL policy was active.

273.   Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Cresti.

274.   Defendants did not notify Mr. Cresti about the cancellation of the GTL policy.

275.   As a result, Mr. Cresti was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

276.   Mr. Cresti reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

277.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Cresti would rely upon these misrepresentations, omissions and/or promises.

278.    Defendants failed to make promised payments with respect to premiums for Mr. Cresti's health and dental insurance. As a result, Mr. Cresti's health and dental insurance plans were cancelled in or around December 2011. The plans were not reinstated until in or around January 2012.

279.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Cresti.

280.    Despite the fact that Defendants ceased payment of Mr. Cresti's health and dental insurance premiums from in or around, Defendants continued to deduct monies from Mr. Cresti's pay for health and dental insurance premiums. Mr. Cresti's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums. These representations were false and/or misleading, as premium payments were not being made during this time.

281.    Furthermore, throughout Mr. Cresti's employment, Defendants made numerous misrepresentations and/or promises that Mr. Cresti would be compensated, in part, by Defendants' payment of medical and dental insurance premiums. These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

282.    Defendants intentionally and affirmatively misrepresented to Mr. Cresti that health and dental insurance premiums would be and were being paid.

283.    Defendants intentionally concealed the non-payment of health and dental insurance premiums from Mr. Cresti.

284.     As a result, deductions were made from Mr. Cresti's pay under fraudulent

pretenses, and Mr. Cresti was not provided with health and dental insurance for a period of time

despite the fact that money was being deducted from his pay to pay for same.

285.     Mr. Cresti reasonably and justifiably relied on Defendants' misrepresentations,

omissions and/or promises as to the payment of premiums and continuing coverage under the

health and dental insurance policies by, *inter alia*, continuing to work for and provide services to

Defendants, not taking the steps necessary to receive payment of the monies fraudulently

withheld and relying on the promised coverage to his detriment when receiving dental services

for a family member.

286.     Defendants knew, or reasonably should have known, that they possessed superior

knowledge and information concerning the payment of premiums for, and continued coverage

under, the health and dental insurance policies, and related matters, and that Mr. Cresti would

rely upon these misrepresentations, omissions and/or promises.

287.     Defendants likewise failed to make contractually agreed upon payments with

respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make

Employee Elective Deferral payments despite their obligation to do so.  Even where the

payments were eventually made, they were often weeks or even months later than required.

288.     However, Defendants' late payment of Employee Elective Deferrals was

concealed from Mr. Cresti.

289.     Despite the fact that Defendants often failed to pay Employee Elective Deferral

payments on behalf of Mr. Cresti, Defendants continued to deduct monies from Mr. Cresti's pay

for the payment of Employee Elective Deferrals.  Mr. Cresti's wage statements during this time

reflected these "deductions" for purported "401K $" payments. These representations were false and/or misleading, as Employee Elective Deferrals were not made with each deduction.

290.    Furthermore, throughout Mr. Cresti's employment, Defendants made numerous misrepresentations and/or promises that Mr. Cresti would be compensated, in part, by Defendants' payment of Employee Elective Deferrals. These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

291.    Defendants intentionally and affirmatively misrepresented to Mr. Cresti that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

292.    Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Cresti.

293.    Defendants did not notify Mr. Cresti about the late payment of Employee Elective Deferrals.

294.    As a result, deductions were made from Mr. Cresti's pay under fraudulent pretenses, and Mr. Cresti was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

295.    Mr. Cresti reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*,

continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

296. Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. Cresti would rely upon these misrepresentations, omissions and/or promises.

297. One of the agreed upon terms of Defendants' contract with Mr. Cresti is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."  Pursuant to this agreement, Mr. Cresti was entitled to 10 days of severance based on his approximately three and a half years of service to RMJM.  In or around January 2012, Mr. Cresti was laid off by RMJM.  He was not paid any severance.

298. Mr. Cresti reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

299. Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Cresti would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

300.    Defendants willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Cresti's wages to pay for benefit premiums, including for GTL insurance premiums, and 401(k) Employee Elective Deferrals.

301.    In fact, compensation allocated by Mr. Cresti for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

ERISA Violations

302.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Cresti continued to be assessed with taxable income for GTL premium payments.

303.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Cresti.

304.    These information returns falsely stated that taxable income was received by Mr. Cresti, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

305.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Cresti's wages to pay for benefit premiums, including health and dental insurance premiums, and 401(k) Employee Elective Deferrals.

306.    In fact, compensation allocated by Mr. Cresti for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

307.    As a result of the filing of fraudulent information returns, Mr. Cresti suffered increased tax liability.

FLSA and NYLL Violations

308.   During Mr. Cresti's employment, Defendants often failed to make timely wage payments.

309.   Defendants' untimely wage payments to Mr. Cresti were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

310.   Defendants often made wage payments to Mr. Cresti several days, weeks or even months late.

311.   Mr. Cresti did not consent to these late, untimely wage payments.

312.   To the contrary, Mr. Cresti complained about Defendants' repeated failure to make payroll in a timely fashion.

313.   Though Mr. Cresti's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

314.   Defendants provided Mr. Cresti with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, health and dental insurance premiums and Employee Elective Deferrals.

315.   In or around January 2012, Mr. Cresti separated from employment with Defendants.

316.   On Mr. Cresti's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of retained compensation for benefit premiums that were never actually paid,

including but not limited to health and dental insurance premiums, Employee Elective Deferrals and severance.

317.    Defendants failed to pay Mr. Cresti's remaining wages due in the next regular pay period following the separation of his employment.

318.    To date, Defendants have failed to pay Mr. Cresti all wages and other agreed upon compensation due.

319.    Defendants made unlawful deductions from Mr. Cresti's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums; (iv) Employee Elective Deferrals and (v) severance.

320.    Defendants also made unlawful deductions from Mr. Cresti's wages by retaining and simply not paying Mr. Cresti's wages for periods of time.

321.    For the periods of time for which Defendants provided Mr. Cresti with no wage payments, Mr. Cresti was denied minimum wage.

322.    Moreover, Mr. Cresti often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

**V.    Plaintiff Derrin Hawkins**

323.    Derrin Hawkins was employed by Defendants from on or about January 1, 2012 through on or about July 31, 2012.

Breach of Contract

324.    Defendants offered Mr. Hawkins employment and compensation including but not limited to wages and accrued paid vacation, in exchange for his work and services.

325.    Mr. Hawkins accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages and accrued paid vacation.

326.    Thus, there was a meeting of the minds between Mr. Hawkins and Defendants with regard to the material terms of the contract.

327.    Mr. Hawkins performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

328.    Specifically, Defendants breached the contract with Mr. Hawkins by, *inter alia*, failing to compensate Mr. Hawkins with all of his wages and accrued paid vacation.

329.    Mr. Hawkins was simply not paid any compensation and accrued paid vacation for certain portions of his employment.

Defendants' Tortious Conduct

330.    One of the agreed upon terms of Defendants' contract with Mr. Hawkins is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

331.    Mr. Hawkins' employment was involuntarily separated by RMJM due to Defendants' unlawful conduct described herein including but not limited to Defendants' refusal

to timely pay his wages and other benefits.  Pursuant to this agreement, Mr. Hawkins was entitled to severance which he was never paid.

332.    Mr. Hawkins reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

333.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Hawkins would rely upon these misrepresentations, omissions and/or promises.

FLSA and NYLL Violations

334.    During Mr. Hawkins's employment, Defendants often failed to make timely wage payments.

335.    Defendants' untimely wage payments to Mr. Hawkins were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

336.    Defendants often made wage payments to Mr. Hawkins several days, weeks or even months late.

337.    Mr. Hawkins did not consent to these late, untimely wage payments.

338.    To the contrary, Mr. Hawkins complained about Defendants' repeated failure to make payroll in a timely fashion.

339.    Though Mr. Hawkins's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

340. Defendants provided Mr. Hawkins with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, and the amount of wage payments.

341. On Mr. Hawkins's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, and reimbursement of expenses.

342. Defendants failed to pay Mr. Hawkins's remaining wages due in the next regular pay period following the separation of his employment.

343. To date, Defendants have failed to pay Mr. Hawkins all wages and other agreed upon compensation due.

344. Defendants made unlawful deductions from Mr. Hawkins's wages by retaining and simply not paying Mr. Hawkins's wages for periods of time.

345. For the periods of time for which Defendants provided Mr. Hawkins with no wage payments, Mr. Hawkins was denied minimum wage.

346. Moreover, Mr. Hawkins often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## VI. Plaintiff Annette Ilagan

347. Annette Ilagan was employed by Defendants from in or around September 2001 through March 2012 as a Human Resources Generalist.

### Breach of Contract

348. Defendants offered Ms. Ilagan employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for her work and services.

349.    Ms. Ilagan accepted Defendants' offer and entered into an enforceable contract with Defendants whereby she agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate her with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

350.    Thus, there was a meeting of the minds between Ms. Ilagan and Defendants with regard to the material terms of the contract.

351.    Ms. Ilagan performed all her contractual obligations, while Defendants did not perform all of their contractual obligations.

352.    Specifically, Defendants breached the contract with Ms. Ilagan by, *inter alia*, failing to compensate Ms. Ilagan with all of her wages, benefits and wage supplements, including but not limited to, the payment of benefit premiums, including those for a GTL policy, and the payment of Employee Elective Deferrals, as well as unreimbursed expenses.

353.    Ms. Ilagan was simply not paid any compensation, benefits, accrued paid vacation and wage supplements for certain portions of her employment.

Defendants' Tortious Conduct

354.    More specifically, in or around mid-2011, Defendants stopped paying Ms. Ilagan's GTL premiums.

355.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

356.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Ms. Ilagan.

357.    Despite the fact that Defendants ceased payment of Ms. Ilagan's GTL premiums, Defendants continued to provide Ms. Ilagan with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

358.   Specifically, but only by way of example, Ms. Ilagan's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

359.   Furthermore, throughout Ms. Ilagan's employment, Defendants made numerous misrepresentations and/or promises that Ms. Ilagan would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

360.   Defendants intentionally and affirmatively misrepresented to Ms. Ilagan that GTL premiums would be and were being paid and that the GTL policy was active.

361.   Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Ms. Ilagan.

362.   Defendants did not notify Ms. Ilagan about the cancellation of the GTL policy.

363.   As a result, Ms. Ilagan was unable to convert her GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

364.   Ms. Ilagan reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking

necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

365.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Ms. Ilagan would rely upon these misrepresentations, omissions and/or promises.

366.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, through 2012, when Ms. Ilagan ceased participation in Defendants' 401(k) Plan, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

367.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Ms. Ilagan.

368.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Ms. Ilagan, Defendants continued to deduct monies from Ms. Ilagan's pay for the payment of Employee Elective Deferrals.  Ms. Ilagan's wage statements during this time reflected these "deductions" for purported "401K $" payments.  These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

369.    Furthermore, throughout Ms. Ilagan's employment, Defendants made numerous misrepresentations and/or promises that Ms. Ilagan would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy

documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and  401(k) participation is a "core benefit" of employment with RMJM.

370.   Defendants intentionally and affirmatively misrepresented to Ms. Ilagan that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

371.   Defendants intentionally concealed the late payment of Employee Elective Deferrals from Ms. Ilagan.

372.   Defendants did not notify Ms. Ilagan about the late payment of Employee Elective Deferrals.

373.   As a result, deductions were made from Ms. Ilagan's pay under fraudulent pretenses, and Ms. Ilagan was not provided with the investments, investment opportunities, interest and other benefits that she would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from her pay to pay for same.

374.   Ms. Ilagan reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

375.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Ms. Ilagan would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

376.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Ms. Ilagan continued to be assessed with taxable income for GTL premium payments.

377.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Ms. Ilagan.

378.    These information returns falsely stated that taxable income was received by Ms. Ilagan, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

379.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Ms. Ilagan's wages to pay for 401(k) Employee Elective Deferrals.

380.    In fact, compensation allocated by Ms. Ilagan for payment of 401(k) Employee Elective Deferrals was retained by Defendants.

381.    As a result of the filing of fraudulent information returns, Ms. Ilagan suffered increased tax liability.

ERISA Violations

382.    Ms. Ilagan elected to participate in the 401(k) Plan and make Employee Elective Deferrals from her compensation.

383.    Defendants failed to deposit Ms. Ilagan's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

384.    Defendants retained the funds Ms. Ilagan allocated as Employee Elective Deferrals, rather than simply paying it to her as compensation.

385.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Ms. Ilagan as Employee Elective Deferrals for the 401(k) Plan.

386.    As a result, Ms. Ilagan was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

387.    Moreover, Defendants failed to promptly pay premiums for Ms. Ilagan's GTL as required by law and under the terms of the respective benefit plans.

388.    As a result, Ms. Ilagan suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

389.    During Ms. Ilagan's employment, Defendants often failed to make timely wage payments.

390.    Defendants' untimely wage payments to Ms. Ilagan were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

391.    Defendants often made wage payments to Ms. Ilagan several days, weeks or even months late.

392.    Ms. Ilagan did not consent to these late, untimely wage payments.

393.    To the contrary, Ms. Ilagan complained about Defendants' repeated failure to make payroll in a timely fashion.

394.    Though Ms. Ilagan's wage payments were issued late, Defendants still provided her with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

395.    Defendants provided Ms. Ilagan with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums and Employee Elective Deferrals.

396.    In or around March 2012, Ms. Ilagan separated from employment with Defendants.

397.    On Ms. Ilagan's separation date, Defendants owed her, *inter alia*, earned wages for work she had already performed, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums and Employee Elective Deferrals, as well as expenses.

398.    Defendants failed to pay Ms. Ilagan's remaining wages due in the next regular pay period following the separation of her employment.

399.    To date, Defendants have failed to pay Ms. Ilagan all wages and other agreed upon compensation due.

400.    Defendants made unlawful deductions from Ms. Ilagan's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums and (ii) Employee Elective Deferrals.

401.    Defendants also made unlawful deductions from Ms. Ilagan's wages by retaining and simply not paying Ms. Ilagan's wages for periods of time.

402.    For the periods of time for which Defendants provided Ms. Ilagan with no wage payments, Ms. Ilagan was denied minimum wage.

403.    Moreover, Ms. Ilagan often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours she worked in excess of 40 hours.

VII.   **Plaintiff Roger Klein**

404.    Roger Klein was employed by Defendants from in or around January 2008 through March 2012 as a Design Principal.

Breach of Contract

405.    Defendants offered Mr. Klein a written employment contract which included a purported base salary of $225,000, and other compensation, in exchange for his work and services.

406.    Mr. Klein accepted Defendants' offer and entered into an enforceable contract dated January 7, 2008.

407.    Mr. Klein performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

408.    Specifically, Defendants breached the contract with Mr. Klein by, *inter alia*, failing to compensate Mr. Klein with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.

409.    Mr. Klein was simply not paid any wages, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

410.    More specifically, in or around mid-2011, Defendants stopped paying Mr. Klein's GTL premiums.

411.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

412.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Klein.

413.    Despite the fact that Defendants ceased payment of Mr. Klein's GTL premiums, Defendants continued to provide Mr. Klein with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

414.    Specifically, but only by way of example, Mr. Klein's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

415.    Furthermore, throughout Mr. Klein's employment, Defendants made numerous misrepresentations and/or promises that Mr. Klein would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in his offer letter that "[RMJM] will provide … $300,000 in life insurance at no premium cost to you," and company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

416.    Defendants intentionally and affirmatively misrepresented to Mr. Klein that GTL premiums would be and were being paid and that the GTL policy was active.

417.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Klein.

418.    Defendants did not notify Mr. Klein about the cancellation of the GTL policy.

419.    As a result, Mr. Klein was unable to convert his GTL policy to an individual

policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to

ensure continuation of life insurance coverage.

420.    Mr. Klein reasonably and justifiably relied on Defendants' misrepresentations,

omissions and/or promises as to the payment of premiums and continuing coverage under the

GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking

necessary actions to convert the GTL policy to an individual policy, not taking necessary actions

to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to

ensure continuation of life insurance coverage.

421.    Defendants knew, or reasonably should have known, that they possessed superior

knowledge and information concerning the payment of premiums for, and continued coverage

under, the GTL policy, and related matters, and that Mr. Klein would rely upon these

misrepresentations, omissions and/or promises.

422.    Defendants likewise failed to make contractually agreed upon payments with

respect to premiums for Mr. Klein's health and dental insurance.  As a result, Mr. Klein's health

and dental insurance plans were cancelled in or around December 2011.  The plans were not

reinstated until in or around January 2012.

423.    However, Defendants' nonpayment of health and dental insurance premiums

during this time, and the cancellation of those policies, were concealed from Mr. Klein.

424.    Despite the fact that Defendants ceased payment of Mr. Klein's health and dental

insurance premiums, Defendants continued to deduct monies from Mr. Klein's pay for health

and dental insurance premiums.  Mr. Klein's wage statements during this time reflected these

"deductions" for the purported payment of "medical" and "dental" insurance premiums.  These

representations were false and/or misleading, as premium payments were not being made during this time.

425.    Furthermore, throughout Mr. Klein's employment, Defendants made numerous misrepresentations and/or promises that Mr. Klein would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

426.    Defendants intentionally and affirmatively misrepresented to Mr. Klein that health and dental insurance premiums would be and were being paid.

427.    Defendants intentionally concealed the non-payment of health and dental insurance premiums.

428.    As a result, deductions were made from Mr. Klein's pay under fraudulent pretenses, and Mr. Klein was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

429.    Mr. Klein reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

430.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage

under, the health and dental insurance policies, and related matters, and that Mr. Klein would rely upon these misrepresentations, omissions and/or promises.

431.   Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

432.   However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. Klein.

433.   Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. Klein, Defendants continued to deduct monies from Mr. Klein's pay for the payment of Employee Elective Deferrals.  Mr. Klein's wage statements during this time reflected these "deductions" for purported "401K $" payments.  These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

434.   Furthermore, throughout Mr. Klein's employment, Defendants made numerous misrepresentations and/or promises that Mr. Klein would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and  401(k) participation is a "core benefit" of employment with RMJM.

435.   Defendants intentionally and affirmatively misrepresented to Mr. Klein that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

436.   Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Klein.

437.   Defendants did not notify Mr. Klein about the late payment of Employee Elective Deferrals.

438.   As a result, deductions were made from Mr. Klein's pay under fraudulent pretenses, and Mr. Klein was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

439.   Mr. Klein reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

440.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. Klein would rely upon these misrepresentations, omissions and/or promises.

441.   One of the agreed upon terms of Defendants' contract with Mr. Klein is that he would be paid severance in the event his employment with RMJM was involuntarily separated. Defendants involuntarily separated and/or constructively discharged Mr. Klein's employment, and did not make any severance payment to him.

442.    Mr. Klein reasonably and justifiably relied on the representation that he would be entitled to severance in the event he was terminated by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

443.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Klein would rely upon these misrepresentations, omissions and/or promises.

444.    Mr. Klein reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

445.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Klein would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

446.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Klein continued to be assessed with taxable income for GTL premium payments.

447.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Klein.

448.    These information returns falsely stated that taxable income was received by Mr. Klein, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

449.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Klein's wages to pay for benefit premiums and 401(k) Employee Elective Deferrals.

450.    In fact, compensation allocated by Mr. Klein for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

451.    As a result of the filing of fraudulent information returns, Mr. Klein suffered increased tax liability.

ERISA Violations

452.    Mr. Klein elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

453.    Defendants failed to deposit Mr. Klein's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

454.    Defendants retained the funds Mr. Klein allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

455.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. Klein as Employee Elective Deferrals for the 401(k) Plan.

456.    As a result, Mr. Klein was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

457.    Moreover, Defendants failed to promptly pay premiums for Mr. Klein's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

458.    As a result, Mr. Klein suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

459.    During Mr. Klein's employment, Defendants often failed to make timely wage payments.

460.    Defendants agreed in writing to make wage payments to Mr. Klein on a biweekly basis.

461.    Defendants' untimely wage payments to Mr. Klein were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

462.    Defendants often made wage payments to Mr. Klein several days, weeks or even months late.

463.    Mr. Klein did not consent to these late, untimely wage payments.

464.    To the contrary, Mr. Klein complained about Defendants' repeated failure to make payroll in a timely fashion.

465.    Though Mr. Klein's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

466.    Defendants provided Mr. Klein with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health and dental insurance premiums and Employee Elective Deferrals.

467.    In or around March 8, 2012, Mr. Klein separated from employment with Defendants due to the unlawful conduct described herein.

468.    On Mr. Klein's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums and reimbursement of retained compensation for 401(k) Employee Elective Deferrals that were never actually deposited.

469.    Defendants failed to pay Mr. Klein's remaining wages, benefits and wage supplements due in the next regular pay period following the separation of his employment.

470.    To date, Defendants have failed to pay Mr. Klein all wages and other agreed upon compensation due.

471.    Defendants made unlawful deductions from Mr. Klein's wages, for supposed benefits which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, (iv) Employee Elective Deferrals and (v) severance.

472.    Defendants also made unlawful deductions from Mr. Klein's wages by retaining and simply not paying Mr. Klein's wages for periods of time.

473.    For the periods of time for which Defendants provided Mr. Klein with no wage payments, Mr. Klein was denied minimum wage.

474.    Moreover, Mr. Klein often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## VIII.   Vladimir Kvint

475.     Vladimir Kvint was employed by Defendants from in or around March 2009 through December 2012, most recently as a Senior Associate.

Breach of Contract

476.     Defendants offered Mr. Kvint employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

477.     Mr. Kvint accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

478.     Thus, there was a meeting of the minds between Mr. Kvint and Defendants with regard to the material terms of the contract.

479.     Mr. Kvint performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

480.     Specifically, Defendants breached the contract with Mr. Kvint by, *inter alia*, failing to compensate Mr. Kvint with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, severance, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.  Mr. Kvint was simply not paid any compensation, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

481.     More specifically, in or around mid-2011, Defendants stopped paying Mr. Kvint's GTL premiums.

482.     On or about September 1, 2011, the GTL policy was cancelled for non-payment.

483.     However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Kvint.

484.     Despite the fact that Defendants ceased payment of Mr. Kvint's GTL premiums, Defendants continued to provide Mr. Kvint with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

485.     Specifically, but only by way of example, Mr. Kvint's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

486.     Furthermore, throughout Mr. Kvint's employment, Defendants made numerous misrepresentations and/or promises that Mr. Kvint would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

487.     Defendants intentionally and affirmatively misrepresented to Mr. Kvint that GTL premiums would be and were being paid and that the GTL policy was active.

488.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Kvint.

489.    Defendants did not notify Mr. Kvint about the cancellation of the GTL policy.

490.    As a result, Mr. Kvint was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

491.    Mr. Kvint reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

492.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Kvint would rely upon these misrepresentations, omissions and/or promises.

493.    Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Kvint's health and dental insurance.  As a result, Mr. Kvint's health and dental insurance plans were cancelled in or around December 2011.  The plans were not reinstated until in or around January 2012.

494.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Kvint.