# Exhibit B

495.     Despite the fact that Defendants ceased payment of Mr. Kvint's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Kvint's pay for health and dental insurance premiums.  Mr. Kvint's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

496.     Furthermore, throughout Mr. Kvint's employment, Defendants made numerous misrepresentations and/or promises that Mr. Kvint would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

497.     Defendants intentionally and affirmatively misrepresented to Mr. Kvint that health and dental insurance premiums would be and were being paid.

498.     Defendants intentionally concealed the non-payment of health and dental insurance premiums from Mr. Kvint.

499.     As a result, deductions were made from Mr. Kvint's pay under fraudulent pretenses, and Mr. Kvint was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

500.     Mr. Kvint reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to

Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

501.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. Kvint would rely upon these misrepresentations, omissions and/or promises.

502.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

503.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. Kvint.

504.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. Kvint, Defendants continued to deduct monies from Mr. Kvint's pay for the payment of Employee Elective Deferrals.  Mr. Kvint's wage statements during this time reflected these "deductions" for purported "401K $" payments.  These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

505.    Furthermore, throughout Mr. Kvint's employment, Defendants made numerous misrepresentations and/or promises that Mr. Kvint would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax

basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

506.    Defendants intentionally and affirmatively misrepresented to Mr. Kvint that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

507.    Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Kvint.

508.    Defendants did not notify Mr. Kvint about the late payment of Employee Elective Deferrals.

509.    As a result, deductions were made from Mr. Kvint's pay under fraudulent pretenses, and Mr. Kvint was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

510.    Mr. Kvint reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

511.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. Kvint would rely upon these misrepresentations, omissions and/or promises.

512.    One of the agreed upon terms of Defendants' contract with Mr. Kvint is that he would be paid severance, based on his tenure with the company, in the event his employment

with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was

obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed

for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year

but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of

service beginning at year six" for persons employed "Five years +."

513.    Mr. Kvint's employment was involuntarily separated and/or constructively

discharged by RMJM due to Defendants' unlawful conduct and refusal to timely pay his wages

and other benefits.  Pursuant to this agreement, Mr. Kvint was entitled to severance which he

was never paid.

514.    Mr. Kvint reasonably and justifiably relied on Defendants' promise to pay

severance in the event he was laid off by, *inter alia*, continuing to work for and provide services

to Defendants and not voluntarily leaving RMJM.

515.    Defendants knew, or reasonably should have known, that they possessed superior

knowledge and information concerning the payment of severance, and related matters, and that

Mr. Kvint would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

516.    Despite the fact that Defendants stopped making GTL premium payments and the

GTL policy was cancelled, Mr. Kvint continued to be assessed with taxable income for GTL

premium payments.

517.    Defendants willfully filed fraudulent information returns which stated that GTL

premium payments were provided to Mr. Kvint.

518.    These information returns falsely stated that taxable income was received by Mr. Kvint, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

519.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Kvint's wages to pay for benefit premiums, including health and dental insurance premiums, and 401(k) Employee Elective Deferrals.

520.    In fact, compensation allocated by Mr. Kvint for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

521.    As a result of the filing of fraudulent information returns, Mr. Kvint suffered increased tax liability.

ERISA Violations

522.    Mr. Kvint elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

523.    Defendants failed to deposit Mr. Kvint's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

524.    Defendants retained the funds Mr. Kvint allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

525.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. Kvint as Employee Elective Deferrals for the 401(k) Plan.

526.    As a result, Mr. Kvint was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

527.    Moreover, Defendants failed to promptly pay premiums for Mr. Kvint's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

528.    As a result, Mr. Kvint suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

529.    During Mr. Kvint's employment, Defendants often failed to make timely wage payments.

530.    Defendants' untimely wage payments to Mr. Kvint were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

531.    Defendants often made wage payments to Mr. Kvint several days, weeks or even months late.

532.    Mr. Kvint did not consent to these late, untimely wage payments.

533.    To the contrary, Mr. Kvint repeatedly complained about Defendants' repeated failure to make payroll in a timely fashion.  These complaints started in 2008 and continued throughout the remainder of his employment.

534.    Though Mr. Kvint's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

535.    Defendants provided Mr. Kvint with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL

premiums, health insurance premiums, dental insurance premiums and Employee Elective Deferrals.

536.     On Mr. Kvint's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, unpaid expenses, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

537.     Defendants failed to pay Mr. Kvint's remaining wages due in the next regular pay period following the separation of his employment.

538.     To date, Defendants have failed to pay Mr. Kvint all wages and other agreed upon compensation due.

539.     Defendants made unlawful deductions from Mr. Kvint's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, (iv) Employee Elective Deferrals, and (v) severance.

540.     Defendants also made unlawful deductions from Mr. Kvint's wages by retaining and simply not paying Mr. Kvint's wages for periods of time.

541.     For the periods of time for which Defendants provided Mr. Kvint with no wage payments, Mr. Kvint was denied minimum wage.

542.     Moreover, Mr. Kvint often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

IX.   **Plaintiff Kevin McCausland**

543.    Kevin McCausland was employed by Defendants from on or about March 14, 2011 through on or about January 12, 2012, most recently as a Senior Associate.

Breach of Contract

544.    Defendants offered Mr. McCausland employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

545.    Mr. McCausland accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

546.    Thus, there was a meeting of the minds between Mr. McCausland and Defendants with regard to the material terms of the contract.

547.    Mr. McCausland performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

548.    Specifically, Defendants breached the contract with Mr. McCausland by, *inter alia*, failing to compensate Mr. McCausland with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, the payment of Employee Elective Deferrals, and the reimbursement of expenses.

549.    Mr. McCausland was simply not paid any wages, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

550.    More specifically, in or around mid-2011, Defendants stopped paying Mr. McCausland's GTL premiums.

551.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

552.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy were concealed from Mr. McCausland.

553.    Despite the fact that Defendants ceased payment of Mr. McCausland's GTL premiums, Defendants continued to provide Mr. McCausland with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

554.    Specifically, but only by way of example, Mr. McCausland's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

555.    Furthermore, throughout Mr. McCausland's employment, Defendants made numerous misrepresentations and/or promises that Mr. McCausland would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

556.    Defendants intentionally and affirmatively misrepresented to Mr. McCausland that GTL premiums would be and were being paid and that the GTL policy was active.

557.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. McCausland.

558.    Defendants did not notify Mr. McCausland about the cancellation of the GTL policy.

559.    As a result, Mr. McCausland was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

560.    Mr. McCausland reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

561.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. McCausland would rely upon these misrepresentations, omissions and/or promises.

562.    Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. McCausland's health and dental insurance.  As a result, Mr. McCausland's health and dental insurance plans were cancelled in or around December 2011. The plans were not reinstated until in or around January 2012.

563.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. McCausland.

564.    Despite the fact that Defendants ceased payment of Mr. McCausland's health and dental insurance premiums, Defendants continued to deduct monies from Mr. McCausland's pay for health and dental insurance premiums.  Mr. McCausland's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

565.    Furthermore, throughout Mr. McCausland's employment, Defendants made numerous misrepresentations and/or promises that Mr. McCausland would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

566.    Defendants intentionally and affirmatively misrepresented to Mr. McCausland that health and dental insurance premiums would be and were being paid.

567.    Defendants intentionally concealed the non-payment of health and dental insurance premiums.

568.    As a result, deductions were made from Mr. McCausland's pay under fraudulent pretenses and Mr. McCausland was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

569.    Mr. McCausland reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and

provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

570.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. McCausland would rely upon these misrepresentations, omissions and/or promises.

571.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

572.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. McCausland.

573.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. McCausland, Defendants continued to deduct monies from Mr. McCausland's pay for the payment of Employee Elective Deferrals.  Mr. McCausland's wage statements during this time reflected these "deductions" for purported "401K $" payments. These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

574.    Furthermore, throughout Mr. McCausland's employment, Defendants made numerous misrepresentations and/or promises that Mr. McCausland would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective

91

opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

575.   Defendants intentionally and affirmatively misrepresented to Mr. McCausland that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

576.   Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. McCausland.

577.   Defendants did not notify Mr. McCausland about the late payment of Employee Elective Deferrals.

578.   As a result, deductions were made from Mr. McCausland's pay under fraudulent pretenses, and Mr. McCausland was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

579.   Mr. McCausland reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

580.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. McCausland would rely upon these misrepresentations, omissions and/or promises.

581.    One of the agreed upon terms of Defendants' contract with Mr. McCausland is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

582.    Mr. McCausland's employment was involuntarily separated and/or constructively discharged by RMJM due to Defendants' unlawful conduct described herein including but not limited to Defendants' refusal to timely pay his wages and other benefits.  Pursuant to this agreement, Mr. McCausland was entitled to severance which he was never paid.

583.    Mr. McCausland reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

584.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. McCausland would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

585.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. McCausland continued to be assessed with taxable income for GTL premium payments.

586.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. McCausland.

587.    These information returns falsely stated that taxable income was received by Mr. McCausland, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

588.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. McCausland's wages to pay for benefit premiums and 401(k) Employee Elective Deferrals.

589.    In fact, compensation allocated by Mr. McCausland for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

590.    As a result of the filing of fraudulent information returns, Mr. McCausland suffered increased tax liability.

ERISA Violations

591.    Mr. McCausland elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

592.    Defendants failed to deposit Mr. McCausland's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

593.    Defendants retained the funds Mr. McCausland allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

594.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. McCausland as Employee Elective Deferrals for the 401(k) Plan.

595.    As a result, Mr. McCausland was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

596.    Moreover, Defendants failed to promptly pay premiums for Mr. McCausland's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

597.    As a result, Mr. McCausland suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

598.    During Mr. McCausland's employment, Defendants often failed to make timely wage payments.

599.    Defendants' untimely wage payments to Mr. McCausland were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

600.    Defendants often made wage payments to Mr. McCausland several days, weeks or even months late.

601.    Mr. McCausland did not consent to these late, untimely wage payments.

602.    To the contrary, Mr. McCausland complained about Defendants' repeated failure to make payroll in a timely fashion.

603.    Though Mr. McCausland's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

604.    Defendants provided Mr. McCausland with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health insurance premiums and dental insurance premiums.

605.     In or around January 2012, Mr. McCausland separated from employment with Defendants.

606.     On Mr. McCausland's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of expenses and retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

607.     Defendants failed to pay Mr. McCausland's remaining wages due in the next regular pay period following the separation of his employment.

608.     To date, Defendants have failed to pay Mr. McCausland all wages and other agreed upon compensation due.

609.     Defendants made unlawful deductions from Mr. McCausland wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, and (iv) Employee Elective Deferrals.

610.     Defendants also made unlawful deductions from Mr. McCausland's wages by retaining and simply not paying Mr. McCausland's wages for periods of time.

611.     For the periods of time for which Defendants provided Mr. McCausland with no wage payments, Mr. McCausland was denied minimum wage.

612.     Moreover, Mr. McCausland often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

X.    **Plaintiff Brian Meneghin**

613.    Brian Meneghin was employed by Defendants from in or around July 1998 through on or about January 9, 2012, most recently as a Senior Associate.

Breach of Contract

614.    Defendants offered Mr. Meneghin employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

615.    Mr. Meneghin accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

616.    Thus, there was a meeting of the minds between Mr. Meneghin and Defendants with regard to the material terms of the contract.

617.    Mr. Meneghin performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

618.    Specifically, Defendants breached the contract with Mr. Meneghin by, *inter alia*, failing to compensate Mr. Meneghin with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies.

619.    Mr. Meneghin was simply not paid any compensation, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

620.    More specifically, in or around mid-2011, Defendants stopped paying Mr. Meneghin's GTL premiums.

621.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

622.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Meneghin.

623.    Despite the fact that Defendants ceased payment of Mr. Meneghin's GTL premiums, Defendants continued to provide Mr. Meneghin with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

624.    Specifically, but only by way of example, Mr. Meneghin's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

625.    Furthermore, throughout Mr. Meneghin's employment, Defendants made numerous misrepresentations and/or promises that Mr. Meneghin would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

626.    Defendants intentionally and affirmatively misrepresented to Mr. Meneghin that GTL premiums would be and were being paid and that the GTL policy was active.

627.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Meneghin.

628.    Defendants did not notify Mr. Meneghin about the cancellation of the GTL policy.

629.    As a result, Mr. Meneghin was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

630.    Mr. Meneghin reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

631.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Meneghin would rely upon these misrepresentations, omissions and/or promises.

632.    Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Meneghin's health and dental insurance.  As a result, Mr. Meneghin's health and dental insurance plans were cancelled in or around December 2011.

633.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Meneghin.

634.     Despite the fact that Defendants ceased payment of Mr. Meneghin's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Meneghin's pay for health and dental insurance premiums.  Mr. Meneghin's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

635.     Furthermore, throughout Mr. Meneghin's employment, Defendants made numerous misrepresentations and/or promises that Mr. Meneghin would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

636.     Defendants intentionally and affirmatively misrepresented to Mr. Meneghin that health and dental insurance premiums would be and were being paid.

637.     Defendants intentionally concealed the non-payment of health and dental insurance premiums.

638.     As a result, deductions were made from Mr. Meneghin's pay under fraudulent pretenses and Mr. Meneghin was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

639.     Mr. Meneghin reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and

provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

640.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. Meneghin would rely upon these misrepresentations, omissions and/or promises.

641.    One of the agreed upon terms of Defendants' contract with Mr. Meneghin is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

642.    Mr. Meneghin's employment was involuntarily separated by RMJM due to Defendants' unlawful conduct described herein including but not limited to Defendants' refusal to timely pay his wages and other benefits.  Pursuant to this agreement, Mr. Meneghin was entitled to severance which he was never paid.

643.    Mr. Meneghin reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

644.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Meneghin would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

645.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Meneghin continued to be assessed with taxable income for GTL premium payments.

646.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Meneghin.

647.    These information returns falsely stated that taxable income was received by Mr. Meneghin, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

648.    As a result of the filing of fraudulent information returns, Mr. Meneghin suffered increased tax liability.

ERISA Violations

649.    Moreover, Defendants failed to promptly pay premiums for Mr. Meneghin's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

650.    As a result, Mr. Meneghin suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

651.    During Mr. Meneghin's employment, Defendants often failed to make timely wage payments.

652.    Defendants' untimely wage payments to Mr. Meneghin were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

653.     Defendants often made wage payments to Mr. Meneghin several days, weeks or even months late.

654.     Mr. Meneghin did not consent to these late, untimely wage payments.

655.     To the contrary, Mr. Meneghin complained about Defendants' repeated failure to make payroll in a timely fashion.

656.     Though Mr. Meneghin's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

657.     Defendants provided Mr. Meneghin with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health insurance premiums and dental insurance premiums.

658.     In or around January 2012, Mr. Meneghin separated from employment with Defendants.

659.     On Mr. Meneghin's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of expenses and retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, and severance.

660.     Defendants failed to pay Mr. Meneghin's remaining wages due in the next regular pay period following the separation of his employment.

661.     To date, Defendants have failed to pay Mr. Meneghin all wages and other agreed upon compensation due.

662.    Defendants made unlawful deductions from Mr. Meneghin wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums and (iv) severance.

663.    Defendants also made unlawful deductions from Mr. Meneghin's wages by retaining and simply not paying Mr. Meneghin's wages for periods of time.

664.    For the periods of time for which Defendants provided Mr. Meneghin with no wage payments, Mr. Meneghin was denied minimum wage.

665.    Moreover, Mr. Meneghin often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## XI.    **Plaintiff Steve Mylenski**

666.    Steve Mylenski was employed by Defendants from on or about September 20, 2003 through in or around March 2012, most recently as a Project Architect.

Breach of Contract

667.    Defendants offered Mr. Mylenski employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

668.    Mr. Mylenski accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

669.    Thus, there was a meeting of the minds between Mr. Mylenski and Defendants with regard to the material terms of the contract.

670.    Mr. Mylenski performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

671.    Specifically, Defendants breached the contract with Mr. Mylenski by, *inter alia*, failing to compensate Mr. Mylenski with all of his wages, benefits, accrued paid vacation, wage supplements and the payment of benefit premiums, including those for a GTL policy and health and dental insurance, and failed to reimburse Mr. Mylenski's expenses.

672.    Mr. Mylenski was simply not paid any compensation, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

673.    More specifically, in or around mid-2011, Defendants stopped paying Mr. Mylenski's GTL premiums.

674.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

675.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Mylenski.

676.    Despite the fact that Defendants ceased payment of Mr. Mylenski's GTL premiums, Defendants continued to provide Mr. Mylenski with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

677.    Specifically, but only by way of example, Mr. Mylenski's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

678.    Furthermore, throughout Mr. Mylenski's employment, Defendants made numerous misrepresentations and/or promises that Mr. Mylenski would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included

but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

679.    Defendants intentionally and affirmatively misrepresented to Mr. Mylenski that GTL premiums would be and were being paid and that the GTL policy was active.

680.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Mylenski.

681.    Defendants did not notify Mr. Mylenski about the cancellation of the GTL policy.

682.    As a result, Mr. Mylenski was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

683.    Mr. Mylenski reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

684.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage

under, the GTL policy, and related matters, and that Mr. Mylenski would rely upon these misrepresentations, omissions and/or promises.

685.    Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Mylenski's health and dental insurance.  As a result, Mr. Mylenski's health and dental insurance plans were cancelled in or around December 2011.  The plans were not reinstated until in or around January 2012.

686.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Mylenski.

687.    Despite the fact that Defendants ceased payment of Mr. Mylenski's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Mylenski's pay for health and dental insurance premiums.  Mr. Mylenski's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

688.    Furthermore, throughout Mr. Mylenski's employment, Defendants made numerous misrepresentations and/or promises that Mr. Mylenski would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

689.    Defendants intentionally and affirmatively misrepresented to Mr. Mylenski that health and dental insurance premiums would be and were being paid.

690.   Defendants intentionally concealed the non-payment of health and dental insurance premiums.

691.   As a result, deductions were made from Mr. Mylenski's pay under fraudulent pretenses and Mr. Mylenski was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

692.   Mr. Mylenski reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

693.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. Mylenski would rely upon these misrepresentations, omissions and/or promises.

694.   One of the agreed upon terms of Defendants' contract with Mr. Mylenski is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

695.   Mr. Mylenski's employment was involuntarily separated and/or constructively discharged by RMJM due to Defendants' unlawful conduct described herein including but not

limited to Defendants' refusal to timely pay his wages and other benefits.  Pursuant to this

agreement, Mr. Mylenski was entitled to severance which he was never paid.

696.    Mr. Mylenski reasonably and justifiably relied on Defendants' promise to pay

severance in the event he was laid off by, *inter alia*, continuing to work for and provide services

to Defendants and not voluntarily leaving RMJM.

697.    Defendants knew, or reasonably should have known, that they possessed superior

knowledge and information concerning the payment of severance, and related matters, and that

Mr. Mylenski would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

698.    Despite the fact that Defendants stopped making GTL premium payments and the

GTL policy was cancelled, Mr. Mylenski continued to be assessed with taxable income for GTL

premium payments.

699.    Defendants willfully filed fraudulent information returns which stated that GTL

premium payments were provided to Mr. Mylenski.

700.    These information returns falsely stated that taxable income was received by Mr.

Mylenski, from Defendants, in the form of GTL premium payments, which were never actually

paid by Defendants.

701.    Defendants also willfully filed fraudulent information returns which stated that

Defendants made deductions from Mr. Mylenski's wages to pay for other benefit premiums,

including those for health and dental insurance.

702.    In fact, compensation allocated by Mr. Mylenski for payment of benefit premiums

was retained by Defendants.

703.     As a result of the filing of fraudulent information returns, Mr. Mylenski suffered

increased tax liability.

ERISA Violations

704.     Defendants failed to promptly pay premiums for Mr. Mylenski's health insurance,

dental insurance and GTL as required by law and under the terms of the respective benefit plans.

705.     As a result, Mr. Mylenski suffered from lapses in benefits coverage up to and

including termination of such benefits.

FLSA and NYLL Violations

706.     During Mr. Mylenski's employment, Defendants often failed to make timely

wage payments.

707.     Defendants' untimely wage payments to Mr. Mylenski were in violation of the

agreed upon terms of employment and often resulted in the payment of wages less frequently

than semi-monthly.

708.     Defendants often made wage payments to Mr. Mylenski several days, weeks or

even months late.

709.     Mr. Mylenski did not consent to these late, untimely wage payments.

710.     To the contrary, Mr. Mylenski complained about Defendants' repeated failure to

make payroll in a timely fashion.

711.     Though Mr. Mylenski's wage payments were issued late, Defendants still

provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage

payments had actually been made in the proper manner.

712.     Defendants provided Mr. Mylenski with wage statements rife with inaccuracies

and misrepresentations, including but not limited to, the date of wage payments, the amount of

wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health insurance premiums and dental insurance premiums.

713.    In or around March 2012, Mr. Mylenski separated from employment with Defendants.

714.    On Mr. Mylenski's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of expenses and retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, and severance.

715.    Defendants failed to pay Mr. Mylenski's remaining wages due in the next regular pay period following the separation of his employment.

716.    To date, Defendants have failed to pay Mr. Mylenski all wages and other agreed upon compensation due.

717.    Defendants made unlawful deductions from Mr. Mylenski wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums and (iv) severance.

718.    Defendants also made unlawful deductions from Mr. Mylenski's wages by retaining and simply not paying Mr. Mylenski's wages for periods of time.

719.    For the periods of time for which Defendants provided Mr. Mylenski with no wage payments, Mr. Mylenski was denied minimum wage.

720.    Moreover, Mr. Mylenski often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## XII.   **Plaintiff Jamie Palazzolo**

721.    Jamie Palazzolo was employed by Defendants from in or around August 2004 through in or around March 2012 as a Designer.

Breach of Contract

722.    Defendants offered Mr. Palazzolo employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

723.    Mr. Palazzolo accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

724.    Thus, there was a meeting of the minds between Mr. Palazzolo and Defendants with regard to the material terms of the contract.

725.    Mr. Palazzolo performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

726.    Specifically, Defendants breached the contract with Mr. Palazzolo by, *inter alia*, failing to compensate Mr. Palazzolo with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.

727. .  Mr. Palazzolo was simply not paid any compensation, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

728.    More specifically, in or around mid-2011, Defendants stopped paying Mr. Palazzolo's GTL premiums.

729.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

730.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Palazzolo.

731.    Despite the fact that Defendants ceased payment of Mr. Palazzolo's GTL premiums, Defendants continued to provide Mr. Palazzolo with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

732.    Specifically, but only by way of example, Mr. Palazzolo's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

733.    Furthermore, throughout Mr. Palazzolo's employment, Defendants made numerous misrepresentations and/or promises that Mr. Palazzolo would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

734.    Defendants intentionally and affirmatively misrepresented to Mr. Palazzolo that GTL premiums would be and were being paid and that the GTL policy was active.

735.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Palazzolo.

736.    Defendants did not notify Mr. Palazzolo about the cancellation of the GTL policy.

737.    As a result, Mr. Palazzolo was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

738.    Mr. Palazzolo reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

739.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Palazzolo would rely upon these misrepresentations, omissions and/or promises.

740.    Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Palazzolo's health and dental insurance. As a result, Mr. Palazzolo's health and dental insurance plans were cancelled in or around December 2011. The plans were not reinstated until in or around January 2012.

741.    However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Palazzolo.

742.    Despite the fact that Defendants ceased payment of Mr. Palazzolo's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Palazzolo's pay for health and dental insurance premiums.  Mr. Palazzolo's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

743.    Furthermore, throughout Mr. Palazzolo's employment, Defendants made numerous misrepresentations and/or promises that Mr. Palazzolo would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

744.    Defendants intentionally and affirmatively misrepresented to Mr. Palazzolo that health and dental insurance premiums would be and were being paid.

745.    Defendants intentionally concealed the non-payment of health and dental insurance premiums from Mr. Palazzolo.

746.    As a result, deductions were made from Mr. Palazzolo's pay under fraudulent pretenses and Mr. Palazzolo was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

747.    Mr. Palazzolo reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and

115

provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

748.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. Palazzolo would rely upon these misrepresentations, omissions and/or promises.

749.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

750.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. Palazzolo.

751.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. Palazzolo, Defendants continued to deduct monies from Mr. Palazzolo's pay for the payment of Employee Elective Deferrals.  Mr. Palazzolo's wage statements during this time reflected these "deductions" for purported "401K $" payments. These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

752.    Furthermore, throughout Mr. Palazzolo's employment, Defendants made numerous misrepresentations and/or promises that Mr. Palazzolo would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective

116

opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and  401(k) participation is a "core benefit" of employment with RMJM.

753.    Defendants intentionally and affirmatively misrepresented to Mr. Palazzolo that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

754.    Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Palazzolo.

755.    Defendants did not notify Mr. Palazzolo about the late payment of Employee Elective Deferrals.

756.    As a result, deductions were made from Mr. Palazzolo's pay under fraudulent pretenses, and Mr. Palazzolo was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

757.    Mr. Palazzolo reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

758.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. Palazzolo would rely upon these misrepresentations, omissions and/or promises.

759.    One of the agreed upon terms of Defendants' contract with Mr. Palazzolo is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

760.    Mr. Palazzolo's employment was involuntarily separated and/or constructively discharged by RMJM due to Defendants' unlawful conduct described herein including but not limited to Defendants' refusal to timely pay his wages and other benefits.  Pursuant to this agreement, Mr. Palazzolo was entitled to severance which he was never paid.

761.    Mr. Palazzolo reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

762.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Palazzolo would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

763.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Palazzolo continued to be assessed with taxable income for GTL premium payments.

764.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Palazzolo.

765.    These information returns falsely stated that taxable income was received by Mr. Palazzolo, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

766.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Palazzolo's wages to pay for benefit premiums and 401(k) Employee Elective Deferrals.

767.    In fact, compensation allocated by Mr. Palazzolo for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

768.    As a result of the filing of fraudulent information returns, Mr. Palazzolo suffered increased tax liability.

ERISA Violations

769.    Mr. Palazzolo elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

770.    Defendants failed to deposit Mr. Palazzolo's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

771.    Defendants retained the funds Mr. Palazzolo allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

772.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. Palazzolo as Employee Elective Deferrals for the 401(k) Plan.

773.    As a result, Mr. Palazzolo was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

774.    Moreover, Defendants failed to promptly pay premiums for Mr. Palazzolo's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

775.    As a result, Mr. Palazzolo suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

776.    During Mr. Palazzolo's employment, Defendants often failed to make timely wage payments.

777.    Defendants' untimely wage payments to Mr. Palazzolo were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

778.    Defendants often made wage payments to Mr. Palazzolo several days, weeks or even months late.

779.    Mr. Palazzolo did not consent to these late, untimely wage payments.

780.    To the contrary, Mr. Palazzolo complained about Defendants' repeated failure to make payroll in a timely fashion.

781.    Though Mr. Palazzolo's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

782.    Defendants provided Mr. Palazzolo with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health and dental insurance premiums and Employee Elective Deferrals.

783. On or about March 23, 2012, Mr. Palazzolo separated from employment with Defendants.

784. On Mr. Palazzolo's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

785. Defendants failed to pay Mr. Palazzolo's remaining wages due in the next regular pay period following the separation of his employment.

786. To date, Defendants have failed to pay Mr. Palazzolo all wages and other agreed upon compensation due.

787. Defendants made unlawful deductions from Mr. Palazzolo's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, (iv) Employee Elective Deferrals and (v) severance.

788. Defendants also made unlawful deductions from Mr. Palazzolo's wages by retaining and simply not paying Mr. Palazzolo's wages for periods of time.

789. For the periods of time for which Defendants provided Mr. Palazzolo with no wage payments, Mr. Palazzolo was denied minimum wage.

790. Moreover, Mr. Palazzolo often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

XIII.  **Plaintiff Belinda Park**

791.     Plaintiff Belinda Park was employed by Defendants from in or around June 2011, through in or around February 2012, as a Designer.

Breach of Contract

792.     Defendants offered Ms. Park employment and compensation including but not limited to wages, benefits, and wage supplements, in exchange for her work and services.

793.     Ms. Park accepted Defendants' offer and entered into an enforceable contract with Defendants whereby she agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate her with, *inter alia*, wages, benefits and wage supplements.

794.     Thus, there was a meeting of the minds between Ms. Park and Defendants with regard to the material terms of the contract.

795.     Ms. Park performed all her contractual obligations, while Defendants did not perform all of their contractual obligations.

796.     Specifically, Defendants breached the contract with Ms. Park by, *inter alia*, failing to compensate Ms. Park with all of her wages, benefits and wage supplements, including but not limited to, severance, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.

797.     Ms. Park was simply not paid any compensation, benefits and wage supplements for certain portions of her employment.

Defendants' Tortious Conduct

798.     In or around mid-2011, Defendants stopped paying Ms. Park's GTL premiums.

799.     On or about September 1, 2011, the GTL policy was cancelled for non-payment.

800.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy were concealed from Ms. Park.

801.    Despite the fact that Defendants ceased payment of Ms. Park's GTL premiums, Defendants continued to provide Ms. Park with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

802.    Specifically, but only by way of example, Ms. Park's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

803.    Furthermore, throughout Ms. Park's employment, Defendants made numerous misrepresentations and/or promises that Ms. Park would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

804.    Defendants intentionally and affirmatively misrepresented to Ms. Park that GTL premiums would be and were being paid and that the GTL policy was active.

805.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Ms. Park.

806.    Defendants did not notify Ms. Park about the cancellation of the GTL policy.

807.   As a result, Ms. Park was unable to convert her GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

808.   Ms. Park reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

809.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Ms. Park would rely upon these misrepresentations, omissions and/or promises.

810.   Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Ms. Park's health and dental insurance.  As a result, Ms. Park's health and dental insurance plans were cancelled in or around December 2011.  The plans were not reinstated until in or around January 2012.

811.   However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Ms. Park.

812.   Despite the fact that Defendants ceased payment of Ms. Park's health and dental insurance premiums from in or around September 2011 to January 2012, Defendants continued to deduct monies from Ms. Park's pay for health and dental insurance premiums.  Ms. Park's wage statements during this time reflected these "deductions" for the purported payment of

"medical" and "dental" insurance premiums.  These representations were false and/or misleading, as premium payments were not being made during this time.

813.   Furthermore, throughout Ms. Park's employment, Defendants made numerous misrepresentations and/or promises that Ms. Park would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

814.   Defendants intentionally and affirmatively misrepresented to Ms. Park that health and dental insurance premiums would be and were being paid and that the health and dental insurance policies were active at all times.

815.   Defendants intentionally concealed the non-payment of health and dental insurance premiums and the cancellation of the health and dental insurance policies from Ms. Park.

816.   Defendants did not notify Ms. Park about the cancellation of the health and dental insurance policies.

817.   As a result, deductions were made from Ms. Park's pay under fraudulent pretenses, and Ms. Park was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from her pay to pay for same.

818.   Ms. Park reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to

Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

819.     Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Ms. Park would rely upon these misrepresentations, omissions and/or promises.

820.     Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

821.     However, Defendants' late payment of Employee Elective Deferrals was concealed from Ms. Park.

822.     Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Ms. Park, Defendants continued to deduct monies from Ms. Park's pay for the payment of Employee Elective Deferrals.  Ms. Park's wage statements during this time reflected these "deductions" for purported "401K $" payments.  These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

823.     Furthermore, throughout Ms. Park's employment, Defendants made numerous misrepresentations and/or promises that Ms. Park would be compensated, in part, by Defendants' payment of Employee Elective Deferrals.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are

always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

824. Defendants intentionally and affirmatively misrepresented to Ms. Park that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

825. Defendants intentionally concealed the late payment of Employee Elective Deferrals from Ms. Park.

826. Defendants did not notify Ms. Park about the late payment of Employee Elective Deferrals.

827. As a result, deductions were made from Ms. Park's pay under fraudulent pretenses, and Ms. Park was not provided with the investments, investment opportunities, interest and other benefits that she would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from her pay to pay for same.

828. Ms. Park reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

829. Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Ms. Park would rely upon these misrepresentations, omissions and/or promises.

830. One of the agreed upon terms of Defendants' contract with Ms. Park is that she would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated. Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed

for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

831.    Ms. Park's employment was involuntarily separated and/or constructively discharged by RMJM due to Defendants' unlawful conduct described herein including but not limited to Defendants' refusal to timely pay her wages and other benefits.  Pursuant to this agreement, Ms. Park was entitled to severance which she was never paid.

832.    Ms. Park reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

833.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Ms. Park would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

834.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Ms. Park continued to be assessed with taxable income for GTL premium payments.

835.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Ms. Park.

836.    These information returns falsely stated that taxable income was received by Ms. Park, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

837.     Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Ms. Park's wages to pay for benefit premiums, including health and dental insurance premiums, and 401(k) Employee Elective Deferrals.

838.     In fact, compensation allocated by Ms. Park for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

839.     As a result of the filing of fraudulent information returns, Ms. Park suffered increased tax liability.

ERISA Violations

840.     Ms. Park elected to participate in the 401(k) Plan and make Employee Elective Deferrals from her compensation.

841.     Defendants failed to deposit Ms. Park's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

842.     Defendants retained the funds Ms. Park allocated as Employee Elective Deferrals, rather than simply paying it to her as compensation.

843.     Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Ms. Park as Employee Elective Deferrals for the 401(k) Plan.

844.     As a result, Ms. Park was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

845.     Moreover, Defendants failed to promptly pay premiums for Ms. Park's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

846.    As a result, Ms. Park suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

847.    During Ms. Park's employment, Defendants often failed to make timely wage payments.

848.    Defendants' untimely wage payments to Ms. Park were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

849.    Defendants often made wage payments to Ms. Park several days, weeks or even months late.

850.    Ms. Park did not consent to these late, untimely wage payments.

851.    To the contrary, Ms. Park complained about Defendants' repeated failure to make payroll in a timely fashion.

852.    Though Ms. Park's wage payments were issued late, Defendants still provided her with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

853.    Defendants provided Ms. Park with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health insurance premiums, dental insurance premiums and Employee Elective Deferral payments.

854.    On or about August 3, 2012, Ms. Park separated from employment with Defendants.

855.    On Ms. Park's separation date, Defendants owed her, *inter alia*, earned wages for work she had already performed, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

856.    Defendants failed to pay Ms. Park's remaining wages due in the next regular pay period following the separation of her employment.

857.    To date, Defendants have failed to pay Ms. Park all wages and other agreed upon compensation due.

858.    Defendants made unlawful deductions from Ms. Park's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, (iv) 401(k) Employee Elective Deferrals, and (v) severance.

859.    Defendants also made unlawful deductions from Ms. Park's wages by retaining and simply not paying Ms. Park's wages for periods of time.

860.    For the periods of time for which Defendants provided Ms. Park with no wage payments, Ms. Park was denied minimum wage.

861.    Moreover, Ms. Park often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours she worked in excess of 40 hours.

## XIV.   **Plaintiff Sean Roche**

862.    Sean Roche was employed by Defendants from in or around April 2005 through in or around February 2012, most recently as a Principal.

Breach of Contract

863.    Defendants offered Mr. Roche a written employment contract which included a purported base salary of $150,000, and other compensation, in exchange for his work and services.

864.    Mr. Roche accepted Defendants' offers and entered into enforceable contracts during his employment.

865.    In April 2011, Defendants, in writing, promoted Mr. Roche to the position of Principal and offered an increased salary of $176,000, which Mr. Roche accepted.

866.    Mr. Roche performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

867.    Specifically, Defendants breached the contract with Mr. Roche by, *inter alia*, failing to compensate Mr. Roche with all of his wages, benefits, accrued paid vacation, wage supplements, the payment of benefit premiums, including those for a GTL policy and health and dental insurance, and the reimbursement of expenses.

868.    Mr. Roche was simply not paid any wages, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

869.    More specifically, in or around mid-2011, Defendants stopped paying Mr. Roche's GTL premiums.

870.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

871.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy were concealed from Mr. Roche.

872.   Despite the fact that Defendants ceased payment of Mr. Roche's GTL premiums, Defendants continued to provide Mr. Roche with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

873.   Specifically, but only by way of example, Mr. Roche's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

874.   Furthermore, throughout Mr. Roche's employment, Defendants made numerous misrepresentations and/or promises that Mr. Roche would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, the statement in his offer letter that "[RMJM] will provide … $300,000 in life insurance at no premium cost to you," as well as statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

875.   Defendants intentionally and affirmatively misrepresented to Mr. Roche that GTL premiums would be and were being paid and that the GTL policy was active.

876.   Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Roche.

877.   Defendants did not notify Mr. Roche about the cancellation of the GTL policy.

878.   As a result, Mr. Roche was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

879.   Mr. Roche reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

880.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Roche would rely upon these misrepresentations, omissions and/or promises.

881.   Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Roche's health and dental insurance.  As a result, Mr. Roche's health and dental insurance plans were cancelled in or around December 2011.  The plans were not reinstated until in or around January 2012.

882.   However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Roche.

883.   Despite the fact that Defendants ceased payment of Mr. Roche's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Roche's pay for health and dental insurance premiums.  Mr. Roche's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums.  These

representations were false and/or misleading, as premium payments were not being made during this time.

884.    Furthermore, throughout Mr. Roche's employment, Defendants made numerous misrepresentations and/or promises that Mr. Roche would be compensated, in part, by Defendants' payment of medical and dental insurance premiums.  These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

885.    Defendants intentionally and affirmatively misrepresented to Mr. Roche that health and dental insurance premiums would be and were being paid.

886.    Defendants intentionally concealed the non-payment of health and dental insurance premiums from Mr. Roche.

887.    As a result, deductions were made from Mr. Roche's pay under fraudulent pretenses and Mr. Roche was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

888.    Mr. Roche reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

889.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage

under, the health and dental insurance policies, and related matters, and that Mr. Roche would rely upon these misrepresentations, omissions and/or promises.

890.     One of the agreed upon terms of Defendants' contract with Mr. Roche is he would be paid severance in the event his employment with RMJM was involuntarily separated. Defendants involuntarily separated and/or constructively discharged Mr. Roche's employment, and did not make any severance payment to him.

891.     Mr. Roche reasonably and justifiably relied on the original and agreed upon severance, as well as the representation that he would be entitled to severance in the event he was involuntarily separated by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

892.     Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Roche would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

893.     Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Roche continued to be assessed with taxable income for GTL premium payments.

894.     Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Roche.

895.     These information returns falsely stated that taxable income was received by Mr. Roche, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

896.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Roche's wages to pay for benefit premiums.

897.    In fact, compensation allocated by Mr. Roche for payment of benefit premiums was retained by Defendants.

898.    As a result of the filing of fraudulent information returns, Mr. Roche suffered increased tax liability.

ERISA Violations

899.    Moreover, Defendants failed to promptly pay premiums for Mr. Roche's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

900.    As a result, Mr. Roche suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

901.    During Mr. Roche's employment, Defendants often failed to make timely wage payments.

902.    Defendants agreed in writing to make wage payments to Mr. Roche on a biweekly basis.

903.    Defendants' untimely wage payments to Mr. Roche were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

904.    Defendants often made wage payments to Mr. Roche several days, weeks or even months late.

905.    Mr. Roche did not consent to these late, untimely wage payments.

906.    To the contrary, Mr. Roche complained about Defendants' repeated failure to make payroll in a timely fashion.

907.    Though Mr. Roche's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

908.    Defendants provided Mr. Roche with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health insurance premiums and dental insurance premiums.

909.    In or around February 2012, Mr. Roche separated from employment with Defendants due to the unlawful conduct described herein.

910.    On Mr. Roche's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of expenses and retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums and severance.

911.    Defendants failed to pay Mr. Roche's remaining wages, benefits and wage supplements due in the next regular pay period following the separation of his employment.

912.    To date, Defendants have failed to pay Mr. Roche all wages and other agreed upon compensation due.

913.    Defendants made unlawful deductions from Mr. Roche's wages, for supposed benefits which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums and (iv) severance.

914.    Defendants also made unlawful deductions from Mr. Roche's wages by retaining and simply not paying Mr. Roche's wages for periods of time.

915.    For the periods of time for which Defendants provided Mr. Roche with no wage payments, Mr. Roche was denied minimum wage.

916.    Moreover, Mr. Roche often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## XV.    Plaintiff Sal Tomasiello

917.    Sal Tomasiello was employed by Defendants from in or around March 2007 through July 2012, most recently as a Project Architect.

Breach of Contract

918.    Defendants offered Mr. Tomasiello employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

919.    Mr. Tomasiello accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

920.    Thus, there was a meeting of the minds between Mr. Tomasiello and Defendants with regard to the material terms of the contract.

921.    Mr. Tomasiello performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

922.    Specifically, Defendants breached the contract with Mr. Tomasiello by, *inter alia*, failing to compensate Mr. Tomasiello with all of his wages, benefits, accrued paid vacation, and

wage supplements, including but not limited to, the payment of benefit premiums, including those for a GTL policy, dental and health insurance policies, and the payment of Employee Elective Deferrals.

923.     Mr. Tomasiello was simply not paid any compensation, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

924.     In or around mid-2011, Defendants stopped paying Mr. Tomasiello's GTL premiums.

925.     On or about September 1, 2011, the GTL policy was cancelled for non-payment.

926.     However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Tomasiello.

927.     Despite the fact that Defendants ceased payment of Mr. Tomasiello's GTL premiums, Defendants continued to provide Mr. Tomasiello with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

928.     Specifically, but only by way of example, Mr. Tomasiello's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

929.     Furthermore, throughout Mr. Tomasiello's employment, Defendants made numerous misrepresentations and/or promises that Mr. Tomasiello would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance

at no cost to you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

930.    Defendants intentionally and affirmatively misrepresented to Mr. Tomasiello that GTL premiums would be and were being paid and that the GTL policy was active.

931.    Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Tomasiello.

932.    Defendants did not notify Mr. Tomasiello about the cancellation of the GTL policy.

933.    As a result, Mr. Tomasiello was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

934.    Mr. Tomasiello reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

935.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Tomasiello would rely upon these misrepresentations, omissions and/or promises.

936.     Defendants likewise failed to make contractually agreed upon payments with respect to premiums for Mr. Tomasiello's health and dental insurance. As a result, Mr. Tomasiello's health and dental insurance plans were cancelled in or around December 2011. The plans were not reinstated until in or around January 2012.

937.     However, Defendants' nonpayment of health and dental insurance premiums during this time, and the cancellation of those policies, were concealed from Mr. Tomasiello.

938.     Despite the fact that Defendants ceased payment of Mr. Tomasiello's health and dental insurance premiums, Defendants continued to deduct monies from Mr. Tomasiello's pay for health and dental insurance premiums. Mr. Tomasiello's wage statements during this time reflected these "deductions" for the purported payment of "medical" and "dental" insurance premiums. These representations were false and/or misleading, as premium payments were not being made during this time.

939.     Furthermore, throughout Mr. Tomasiello's employment, Defendants made numerous misrepresentations and/or promises that Mr. Tomasiello would be compensated, in part, by Defendants' payment of medical and dental insurance premiums. These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses" and that health insurance was a "core benefit" of employment with RMJM.

940.     Defendants intentionally and affirmatively misrepresented to Mr. Tomasiello that health and dental insurance premiums would be and were being paid.

941.     Defendants intentionally concealed the non-payment of health and dental insurance premiums from Mr. Tomasiello.

942.    As a result, deductions were made from Mr. Tomasiello's pay under fraudulent pretenses and Mr. Tomasiello was not provided with health and dental insurance for a period of time despite the fact that money was being deducted from his pay to pay for same.

943.    Mr. Tomasiello reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the health and dental insurance policies by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

944.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the health and dental insurance policies, and related matters, and that Mr. Tomasiello would rely upon these misrepresentations, omissions and/or promises.

945.    Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make Employee Elective Deferral payments despite their obligation to do so.  Even where the payments were eventually made, they were often weeks or even months later than required.

946.    However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. Tomasiello.

947.    Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. Tomasiello, Defendants continued to deduct monies from Mr. Tomasiello's pay for the payment of Employee Elective Deferrals.  Mr. Tomasiello's wage statements during this time reflected these "deductions" for purported "401K $" payments.

These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

948.    Furthermore, throughout Mr. Tomasiello's employment, Defendants made numerous misrepresentations and/or promises that Mr. Tomasiello would be compensated, in part, by Defendants' payment of Employee Elective Deferrals. These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

949.    Defendants intentionally and affirmatively misrepresented to Mr. Tomasiello that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

950.    Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Tomasiello.

951.    Defendants did not notify Mr. Tomasiello about the late payment of Employee Elective Deferrals.

952.    As a result, deductions were made from Mr. Tomasiello's pay under fraudulent pretenses, and Mr. Tomasiello was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

953.    Mr. Tomasiello reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals

by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

954.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. Tomasiello would rely upon these misrepresentations, omissions and/or promises.

955.    One of the agreed upon terms of Defendants' contract with Mr. Tomasiello is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

956.    Mr. Tomasiello's employment was involuntarily separated and/or constructively discharged by RMJM due to Defendants' unlawful conduct described herein including but not limited to Defendants' refusal to timely pay his wages and other benefits.  Pursuant to this agreement, Mr. Tomasiello was entitled to severance which he was never paid.

957.    Mr. Tomasiello reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

958.    Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Tomasiello would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

959.    Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Tomasiello continued to be assessed with taxable income for GTL premium payments.

960.    Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Tomasiello.

961.    These information returns falsely stated that taxable income was received by Mr. Tomasiello, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

962.    Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Tomasiello's wages to pay for benefit premiums and 401(k) Employee Elective Deferrals.

963.    In fact, compensation allocated by Mr. Tomasiello for payment of benefit premiums and 401(k) Employee Elective Deferrals was retained by Defendants.

964.    As a result of the filing of fraudulent information returns, Mr. Tomasiello suffered increased tax liability.

ERISA Violations

965.    Mr. Tomasiello elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

966.    Defendants failed to deposit Mr. Tomasiello's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

967.    Defendants retained the funds Mr. Tomasiello allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

968.    Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. Tomasiello as Employee Elective Deferrals for the 401(k) Plan.

969.    As a result, Mr. Tomasiello was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

970.    Moreover, Defendants failed to promptly pay premiums for Mr. Tomasiello's health insurance, dental insurance and GTL as required by law and under the terms of the respective benefit plans.

971.    As a result, Mr. Tomasiello suffered from lapses in benefits coverage up to and including termination of such benefits.

FLSA and NYLL Violations

972.    During Mr. Tomasiello's employment, Defendants often failed to make timely wage payments.

973.    Defendants' untimely wage payments to Mr. Tomasiello were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

974.    Defendants often made wage payments to Mr. Tomasiello several days, weeks or even months late.

975.    Mr. Tomasiello did not consent to these late, untimely wage payments.

976.    To the contrary, Mr. Tomasiello complained about Defendants' repeated failure to make payroll in a timely fashion.

977.     Though Mr. Tomasiello's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

978.     Defendants provided Mr. Tomasiello with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums, health dental insurance premiums and Employee Elective Deferrals.

979.     In or around July 2012, Mr. Tomasiello separated from employment with Defendants due to the unlawful conduct described herein.

980.     On Mr. Tomasiello's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, health insurance premiums and dental insurance premiums, Employee Elective Deferrals and severance.

981.     Defendants failed to pay Mr. Tomasiello's remaining wages due in the next regular pay period following the separation of his employment.

982.     To date, Defendants have failed to pay Mr. Tomasiello all wages and other agreed upon compensation due.

983.     Defendants made unlawful deductions from Mr. Tomasiello's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums, (ii) health insurance premiums, (iii) dental insurance premiums, and (iv) Employee Elective Deferrals.

984.    Defendants also made unlawful deductions from Mr. Tomasiello's wages by retaining and simply not paying Mr. Tomasiello's wages for periods of time.

985.    For the periods of time for which Defendants provided Mr. Tomasiello with no wage payments, Mr. Tomasiello was denied minimum wage.

986.    Moreover, Mr. Tomasiello often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## XVI.   Plaintiff Brian Wong

987.    Brian Wong was employed by Defendants from in or around 2010 through in or around March 2012, most recently as an associate.  Mr. Wong was also employed by Defendants in 2008.

Breach of Contract

988.    Defendants offered Mr. Wong employment and compensation including but not limited to wages, benefits, accrued paid vacation, and wage supplements, in exchange for his work and services.

989.    Mr. Wong accepted Defendants' offer and entered into an enforceable contract with Defendants whereby he agreed to provide work and services to Defendants and, in exchange, Defendants agreed to compensate him with, *inter alia*, wages, benefits, accrued paid vacation and wage supplements.

990.    Thus, there was a meeting of the minds between Mr. Wong and Defendants with regard to the material terms of the contract.

991.    Mr. Wong performed all his contractual obligations, while Defendants did not perform all of their contractual obligations.

992.    Specifically, Defendants breached the contract with Mr. Wong by, *inter alia*, failing to compensate Mr. Wong with all of his wages, benefits, accrued paid vacation, and wage supplements, including but not limited to, the payment of GTL premiums and the payment of Employee Elective Deferrals.

993.    Mr. Wong was simply not paid any wages, benefits, accrued paid vacation and wage supplements for certain portions of his employment.

Defendants' Tortious Conduct

994.    In or around mid-2011, Defendants stopped paying Mr. Wong's GTL premiums.

995.    On or about September 1, 2011, the GTL policy was cancelled for non-payment.

996.    However, Defendants' nonpayment of GTL premiums and cancellation of the policy was concealed from Mr. Wong.

997.    Despite the fact that Defendants ceased payment of Mr. Wong's GTL premiums, Defendants continued to provide Mr. Wong with wage statements which misrepresented that Defendants were continuing to pay premiums for the GTL policy.

998.    Specifically, but only by way of example, Mr. Wong's wage statements throughout 2011 and 2012 reflect premium payments for "Gtl [Group Term Life]" as imputed taxable income under the "Other Benefits and Information" section.

999.    Furthermore, throughout Mr. Wong's employment, Defendants made numerous misrepresentations and/or promises that Mr. Wong would be compensated, in part, by Defendants' payment of GTL premiums.  These misrepresentations and/or promises included but was not limited to, statements in company handbooks and policy documents which stated that Defendants would provide "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you," "provide eligible employees with Basic Life Insurance at no cost to

you," and that "[f]or coverage in excess of $50,000, the value of the premium paid by the Company will appear as taxable income to the employee based on age and amount of coverage provided during the year."

1000.   Defendants intentionally and affirmatively misrepresented to Mr. Wong that GTL premiums would be and were being paid and that the GTL policy was active.

1001.   Defendants intentionally concealed the non-payment of GTL premiums and the cancellation of the GTL policy from Mr. Wong.

1002.   Defendants did not notify Mr. Wong about the cancellation of the GTL policy.

1003.   As a result, Mr. Wong was unable to convert his GTL policy to an individual policy, obtain a replacement life insurance policy, or otherwise take the necessary actions to ensure continuation of life insurance coverage.

1004.   Mr. Wong reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of premiums and continuing coverage under the GTL policy by, *inter alia*, continuing to work for and provide services to Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

1005.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of premiums for, and continued coverage under, the GTL policy, and related matters, and that Mr. Wong would rely upon these misrepresentations, omissions and/or promises.

1006.   Defendants likewise failed to make contractually agreed upon payments with respect to Employee Elective Deferrals.  Indeed, Defendants often simply did not make

Employee Elective Deferral payments despite their obligation to do so. Even where the payments were eventually made, they were often weeks or even months later than required.

1007. However, Defendants' late payment of Employee Elective Deferrals was concealed from Mr. Wong.

1008. Despite the fact that Defendants often failed to pay Employee Elective Deferral payments on behalf of Mr. Wong, Defendants continued to deduct monies from Mr. Wong's pay for the payment of Employee Elective Deferrals. Mr. Wong's wage statements during this time reflected these "deductions" for purported "401K $" payments. These representations were false and/or misleading, as the Employee Elective Deferrals were not made with each deduction.

1009. Furthermore, throughout Mr. Wong's employment, Defendants made numerous misrepresentations and/or promises that Mr. Wong would be compensated, in part, by Defendants' payment of Employee Elective Deferrals. These misrepresentations and/or promises included but were not limited to, statements in company handbooks and policy documents which stated that "[t]he RMJM 401k Plan provides a convenient, tax effective opportunity for employees to save, invest and prepare for their future financial needs on a pre-tax basis," "[e]mployees are always 100% vested in the current value (including any investment earnings) of their own savings" and 401(k) participation is a "core benefit" of employment with RMJM.

1010. Defendants intentionally and affirmatively misrepresented to Mr. Wong that Employee Elective Deferrals would be and were being paid on a timely basis at all times.

1011. Defendants intentionally concealed the late payment of Employee Elective Deferrals from Mr. Wong.

1012.   Defendants did not notify Mr. Wong about the late payment of Employee Elective Deferrals.

1013.   As a result, deductions were made from Mr. Wong's pay under fraudulent pretenses, and Mr. Wong was not provided with the investments, investment opportunities, interest and other benefits that he would have obtained if the Employee Elective Deferrals were timely paid, despite the fact that money was being deducted from his pay to pay for same.

1014.   Mr. Wong reasonably and justifiably relied on Defendants' misrepresentations, omissions and/or promises as to the payment of Employee Elective Deferrals by, *inter alia*, continuing to work for and provide services to Defendants and not taking the steps necessary to receive payment of the monies fraudulently withheld.

1015.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of Employee Elective Deferrals, and related matters, and that Mr. Wong would rely upon these misrepresentations, omissions and/or promises.

1016.   One of the agreed upon terms of Defendants' contract with Mr. Wong is that he would be paid severance, based on his tenure with the company, in the event his employment with RMJM was involuntarily separated.  Pursuant to the terms of this agreement, RMJM was obligated to pay to its non-Principal employees: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

1017.   Mr. Wong's employment was involuntarily separated and/or constructively discharged by RMJM due to Defendants' unlawful conduct described herein including but not

limited to Defendants' refusal to timely pay his wages and other benefits. Pursuant to this agreement, Mr. Wong was entitled to severance which he was never paid.

1018. Mr. Wong reasonably and justifiably relied on Defendants' promise to pay severance in the event he was laid off by, *inter alia*, continuing to work for and provide services to Defendants and not voluntarily leaving RMJM.

1019. Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning the payment of severance, and related matters, and that Mr. Wong would rely upon these misrepresentations, omissions and/or promises.

IRC Violations

1020. Despite the fact that Defendants stopped making GTL premium payments and the GTL policy was cancelled, Mr. Wong continued to be assessed with taxable income for GTL premium payments.

1021. Defendants willfully filed fraudulent information returns which stated that GTL premium payments were provided to Mr. Wong.

1022. These information returns falsely stated that taxable income was received by Mr. Wong, from Defendants, in the form of GTL premium payments, which were never actually paid by Defendants.

1023. Defendants also willfully filed fraudulent information returns which stated that Defendants made deductions from Mr. Wong's wages to pay for 401(k) Employee Elective Deferrals.

1024. In fact, compensation allocated by Mr. Wong for payment of 401(k) Employee Elective Deferrals was retained by Defendants.

1025.   As a result of the filing of fraudulent information returns, Mr. Wong suffered increased tax liability.

## ERISA Violations

1026.   Mr. Wong elected to participate in the 401(k) Plan and make Employee Elective Deferrals from his compensation.

1027.   Defendants failed to deposit Mr. Wong's Employee Elective Deferrals in the 401(k) Plan for periods of time, sometimes for many months.

1028.   Defendants retained the funds Mr. Wong allocated as Employee Elective Deferrals, rather than simply paying it to him as compensation.

1029.   Defendants intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Mr. Wong as Employee Elective Deferrals for the 401(k) Plan.

1030.   As a result, Mr. Wong was damaged by a loss of investments, loss of investment opportunities, and loss of interest.

1031.   Moreover, Defendants failed to promptly pay premiums for Mr. Wong's GTL as required by law and under the terms of the benefit plan.

1032.   As a result, Mr. Wong suffered from lapses in benefits coverage up to and including termination of such benefits.

## FLSA and NYLL Violations

1033.   During Mr. Wong's employment, Defendants often failed to make timely wage payments.

1034.   Defendants' untimely wage payments to Mr. Wong were in violation of the agreed upon terms of employment and often resulted in the payment of wages less frequently than semi-monthly.

1035.   Defendants often made wage payments to Mr. Wong several days, weeks or even months late.

1036.   Mr. Wong did not consent to these late, untimely wage payments.

1037.   To the contrary, Mr. Wong complained about Defendants' repeated failure to make payroll in a timely fashion.

1038.   Though Mr. Wong's wage payments were issued late, Defendants still provided him with false, misleading and inaccurate bi-weekly wage statements, as though wage payments had actually been made in the proper manner.

1039.   Defendants provided Mr. Wong with wage statements rife with inaccuracies and misrepresentations, including but not limited to, the date of wage payments, the amount of wage payments, and the payment of benefits and wage supplements, including but not limited to, GTL premiums and Employee Elective Deferrals.

1040.   In or around March 2012, Mr. Wong separated from employment with Defendants due to the unlawful conduct described herein.

1041.   On Mr. Wong's separation date, Defendants owed him, *inter alia*, earned wages for work he had already performed, payment for accrued but unused vacation time, reimbursement of retained compensation for benefit premiums that were never actually paid, including but not limited to GTL premiums, and Employee Elective Deferrals.

1042.   Defendants failed to pay Mr. Wong's remaining wages due in the next regular pay period following the separation of his employment.

1043.   To date, Defendants have failed to pay Mr. Wong all wages and other agreed upon compensation due.

1044.   Defendants made unlawful deductions from Mr. Wong's wages, for supposed benefits and wage supplements which were never actually paid, including but not limited to, (i) GTL premiums and (ii) Employee Elective Deferrals.

1045.   Defendants also made unlawful deductions from Mr. Wong's wages by retaining and simply not paying Mr. Wong's wages for periods of time.

1046.   For the periods of time for which Defendants provided Mr. Wong with no wage payments, Mr. Wong was denied minimum wage.

1047.   Moreover, Wong often worked in excess of 40 hours per week and was not paid premium overtime compensation for the hours he worked in excess of 40 hours.

## FIRST CAUSE OF ACTION
### (Failure to Pay Minimum Wage in Violation of the Fair Labor Standards Act)

1048.   Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1049.   At all relevant times, Plaintiffs and the FLSA Collective were "employees" within the meaning of the FLSA.

1050.   Defendants knowingly failed to pay Plaintiffs and the members of the FLSA Collective the federally mandated minimum wage in violation of 29 U.S.C. § 206 for the periods of employment during which no wage payments were made as set forth above.

1051.   Defendants' failure to pay the minimum wage was willful within the meaning of 29 U.S.C. § 255(a).

1052.   Plaintiffs did not regularly receive, each pay period on a weekly or less frequent basis, a predetermined amount of compensation.

1053.   Plaintiffs and the FLSA Collective were not paid on a "salary basis" for, at a minimum, the periods of employment during which no wage payments were made.

1054.   Defendants' failure to make wage payments constituted unlawful deductions and withholdings from wages and indicated that Defendants did not intend to pay Plaintiffs or the FLSA Collective on a "salary basis."

1055.   As a result of Defendants' willful and unlawful conduct, Plaintiffs and the members of the FLSA Collective are entitled to an award of damages in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Failure to Pay Overtime in Violation of the Fair Labor Standards Act)

1056.   Plaintiffs[2], on behalf of themselves and the FLSA Collective, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1057.   The FLSA requires covered employers, such as Defendants, to pay all non-exempt employees at a rate of not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per workweek.

---

[2]      Plaintiff Dana Byrne does not allege overtime claims.

1058.   Said Plaintiffs and the FLSA Collective were not exempt from this requirement because, *inter alia*, said Plaintiffs and the FLSA Collective were not paid on a "salary basis."

1059.   Defendants' failure to make wage payments constituted unlawful deductions and withholdings from wages and indicated that Defendants did not intend to pay Plaintiffs or the FLSA Collective on a "salary basis."

1060.   During the FLSA Collective Period, Defendants knew that said Plaintiffs and the FLSA Collective worked in excess of 40 hours per week but did not pay them premium overtime compensation for each hour worked in excess of 40 hours per workweek.

1061.   As a result of Defendants' failure to pay said Plaintiffs and the FLSA Collective overtime at a rate of one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per workweek, Defendants violated the FLSA.

1062.   The foregoing conduct of Defendants constitutes willful violations of the FLSA.

1063.   Defendants' violations of the FLSA have significantly damaged said Plaintiffs and the FLSA Collective and entitle them to recover the total amount of their unpaid overtime wages, an additional equal amount in liquidated damages, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
### (Failure to Minimum Wage in Violation of New York Labor Law)

1064.   Plaintiffs, on behalf of themselves and the NYLL Class, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1065.   At all relevant times, Plaintiffs and the NYLL Class were "employees" within the meaning of the NYLL.  Similarly, at all relevant times, Defendants, including the individually named Defendants, were "employers" within the meaning of the NYLL.

1066.   Defendants knowingly failed to pay Plaintiffs and the members of the NYLL Class the New York minimum wage required under New York Labor Law § 652 and supporting regulations of the New York State Department of Labor for the periods of employment during which no wage payments were made to Plaintiffs and the NYLL Class.

1067.   Plaintiffs' earnings were not in excess of $900 per week for, at a minimum, the weeks during which no wage payments were made.

1068.   Plaintiffs' earnings were not regularly in excess of $900 per week due to Defendants frequent non-payment and withholdings of wages for considerable period of time.

1069.   Plaintiffs were all "clerical and other workers" under NYLL Section 190(7) because they were not regularly paid $900 per week.

1070.   Defendants' failure to pay Plaintiffs and the members of the NYLL Class the minimum wage was willful and not based on any good faith belief of compliance with New York Labor Law § 663.

1071.   As a result of Defendants' willful and unlawful conduct, Plaintiffs and the members of the NYLL Class are entitled to an award of damages in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (Failure to Pay Overtime in Violation of the New York Labor Law)

1072.   Plaintiffs[3], on behalf of themselves and the NYLL Class, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1073.   The NYLL and 12 N.Y.C.R.R. § 142-2.2 require a covered employer, such as Defendants, to pay employees overtime at a rate of one and one-half times the employee's

---

[3]      Plaintiff Dana Byrne does not allege overtime claims, *see supra* at note 2.

regular rate of pay in the manner and methods provided in the FLSA, and subject to the exemptions set forth in the FLSA.

1074.   Said Plaintiffs and the NYLL Class were not exempt from this requirement because, *inter alia*, and as described above, Defendants will be unable to demonstrate that said Plaintiffs are paid either (a) on a "salary basis" pursuant to the FLSA, or (b) in excess of $900 per week due to Defendants' frequent non-payment and withholdings of wages for considerable period of time.

1075.   During the NYLL Class Period, Defendants knew that said Plaintiffs and the NYLL Class worked in excess of 40 hours per week, but Defendants did not pay them overtime for each hour worked in excess of 40 hours per workweek.

1076.   As a result of Defendants' failure to pay said Plaintiffs and the NYLL Class overtime premium compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per workweek, Defendants violated the NYLL and/or its regulations.

1077.   The foregoing conduct of Defendants constitutes willful violations of the NYLL and/or its regulations.

1078.   Defendants' violations of the NYLL and/or its regulations have significantly damaged said Plaintiffs and the NYLL Class and entitle them to recover the total amount of their unpaid overtime wages, an additional equal amount in liquidated damages, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**(Unlawful Deductions in Violation of New York Labor Law)**

1079.   Plaintiffs, on behalf of themselves and the NYLL Class, hereby repeat and reallege each and every allegation as contained in each of the preceding paragraphs as if fully set forth and contained herein.

1080.   At all relevant times, Plaintiffs and the NYLL Class were "employees" within the meaning of the New York Labor Law.  Similarly, at all relevant times, Defendants, including the individually named Defendants, were "employers" within the meaning of the New York Labor Law.

1081.   As described above, Defendants made unlawful deductions and withholdings from Plaintiffs and the NYLL Class' wages when Defendants retained compensation intended to be allocated for payment health insurance premiums, dental insurance premiums, GTL premiums, and 401(k) Employee Elective Deferrals.

1082.   As described above, Defendants made unlawful deductions and withholdings from Plaintiffs and the NYLL Class' wages when Defendants failed to reimburse Plaintiffs and the NYLL Class for business expenses and wire transfer fees associated with wage payments.

1083.   As described above, Defendants made unlawful deductions and withholdings from Plaintiffs and the NYLL Class' wages when Defendants failed to pay owed and earned severance payments.

1084.   As described above, Defendants made unlawful deductions and withholdings from Plaintiffs and the NYLL Class' wages when Defendants did not pay Plaintiffs and the NYLL Class' wages at all for periods of time.

1085.   Due to the unlawful conduct described above, Defendants made unlawful deductions from the wages of Plaintiffs and the NYLL Class that were not for a permissible purpose as defined by New York Labor Law § 193 *et seq.*

1086.   Defendants' unlawful deductions and withholdings from Plaintiffs and the NYLL Class' wages were willful and not based on any good faith belief of compliance with the New York Labor Law.

1087.   Defendants willfully, intentionally, fraudulently and deliberately refused to make these wage payments owed to Plaintiffs and the NYLL Class, despite demands for payment of such compensation, in violation of New York Labor Law §§ 193 *et seq.*

1088.   As a result of the foregoing, Plaintiffs and the NYLL Class have been denied wages required under New York Labor Law §§ 193 *et seq.*, and are entitled to an award for unpaid wages and unlawful deductions in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Failure to Provide Accurate Wage Statements in Violation of the New York Labor Law)

1089.   Plaintiffs, on behalf of themselves and the NYLL Class, hereby repeat and reallege each and every allegation as contained in each of the preceding paragraphs as if fully set forth and contained herein.

1090.   The New York Labor Law requires covered employers, such as Defendants, to furnish accurate wage statements to their employees with every payment of wages, and Plaintiffs and the NYLL Class were not exempt from this requirement.

1091.   Defendants failed to furnish accurate wage statements to Plaintiffs and the NYLL Class, in violation of NYLL § 195 by, *inter alia*, providing Plaintiffs and the NYLL Class with wage statements that contained inaccurate dates of wage payments, amounts of wage payments,

and information regarding the payment of benefits and wage supplements including but not limited to, health insurance premiums, dental insurance premiums, GTL premiums, and 401(k) Employee Elective Deferrals.

1092.   The foregoing conduct of Defendants constitutes willful violations of the NYLL and/or its regulations.

1093.   Defendants' violations of the NYLL have significantly damaged Plaintiffs and the NYLL Class and entitle them to recover damages of one hundred dollars per person affected for each work week that such violations occurred, up to a total of twenty-five hundred dollars per person affected, together with attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
**(Failure to Make Wage Payments with Requisite Frequency
in Violation of the New York Labor Law)**

1094.   Plaintiffs, on behalf of themselves and the NYLL Class, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1095.   The NYLL requires covered employers, such as Defendants, to provide Plaintiffs and the NYLL Class wages earned in accordance with the agreed upon terms of their employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer.

1096.   Defendants failed to provide Plaintiffs and the NYLL Class wages earned in accordance with the agreed upon terms of their employment, and often paid Plaintiffs and the NYLL Class less frequently than semi-monthly, in violation of NYLL § 191.

1097.   The NYLL requires covered employers, such as Defendants, to provide Plaintiffs and the NYLL Class members who were terminated or separated from employment with the

remaining wages owed not later than the regular pay day for the pay period during which the termination occurred.

1098.   Defendants failed to provide Plaintiffs and the NYLL Class members who were terminated or separated from employment with their remaining wages owed not later than the regular pay day for the pay period during which the termination occurred.

1099.   The foregoing conduct of Defendants constitutes willful violations of the NYLL and/or its regulations.

1100.   Defendants' violations of the NYLL have significantly damaged Plaintiffs and the NYLL Class and entitle them to recover damages in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### (Fraudulent Filing of Information Returns in Violation of Internal Revenue Code)

1101.   Plaintiffs, on behalf of themselves and the IRC Class, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1102.   26 U.S.C. § 7434 provides that where any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person filing such information return.

1103.   As described above, Defendants willfully filed fraudulent information returns with respect to payments purported to be made to Plaintiffs and the IRC Class.  These information returns falsely stated that taxable income was received by Plaintiffs and the IRC Class in the form of benefits and wage supplements, including but not limited to GTL premium payments, which were never actually paid.

165

1104.   As described above, these information returns also falsely stated that Plaintiffs and the IRC Class received benefits and wage supplements in the form of payment of health insurance premiums, dental insurance premiums, GTL premiums and 401(k) Employee Elective Deferrals.

1105.   As a result, Plaintiffs and the IRC Class suffered increased tax liability.

1106.   Defendants' violations of 26 U.S.C. § 7434 have significantly damaged Plaintiffs and the IRC Class, and entitle Plaintiffs and the IRC Class to recover damages of the greater of: (a) $5,000 per person; or (b) the actual economic damages sustained as a proximate result of the filing of the fraudulent information return (including any costs attributable to resolving the deficiencies asserted as a result of such filing), plus the costs of the instant action, plus reasonable attorneys' fees.

## NINTH CAUSE OF ACTION
### (ERISA Violations as to the 401(k) Plan)

1107.   Plaintiffs,  on behalf of themselves and the ERISA Class, hereby repeat and reallege each and every allegation as contained in each of the preceding paragraphs as if fully set forth and contained herein.

1108.   Plaintiffs and the members of the ERISA Class assert this action pursuant to Section 1132(a)(3) of ERISA.

1109.   As described above, Plaintiffs and the members of the ERISA Class made Employee Elective Deferrals from their compensation into the 401(k) Plan.

1110.   As described above, Defendants unlawfully retained compensation owed to Plaintiffs and the members of the ERISA Class which had been allocated by each of them as Employee Elective Deferrals for the 401(k) Plan.

1111.   Defendants were and remain fiduciaries of the 401(k) Plan and intentionally concealed, hid and failed to disclose their unlawful retention of compensation which had been allocated by Plaintiffs as Employee Elective Deferrals for the 401(k) Plan.

1112.   Defendants breached their fiduciary duties under Section 1109 of ERISA as they violated their responsibilities, obligations and/or duties owed to Plaintiffs and the members of the ERISA Class, to ensure that compensation allocated for Employee Elective Deferrals for the 401(k) Plan were paid and actually be deposited in the 401(k) Plan.

1113.   As a result of Defendants' unlawful conduct, Defendants are liable to Plaintiffs and the ERISA Class for any losses resulting from their breach, including but not limited to loss of investments, loss of investment opportunities, and loss of interest, as well as the profits Defendants made through the use of the assets retained by Defendants, in addition to reasonable attorneys' fees and costs, and all other available relief.

## TENTH CAUSE OF ACTION
### (ERISA Violations as to Welfare Benefit Plans)

1114.   Plaintiffs, on behalf of themselves and the ERISA Class, hereby repeat and reallege each and every allegation as contained in each of the preceding paragraphs as if fully set forth and contained herein.

1115.   As described above, Plaintiffs and the members of the ERISA Class were, at all relevant times, participants and/or beneficiaries under certain of Defendants' welfare benefit plans, including but not limited to health insurance plans, dental insurance plans and GTL plans.

1116.   Defendants were, at all relevant times, fiduciaries of said welfare benefit plans in which Plaintiffs and the members of the ERISA Class were participants and/or beneficiaries, and as such, owed Plaintiffs and the members of the ERISA Class a duty to act with care, skill, prudence and diligence pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

1117.   Defendants breached their fiduciary duties to Plaintiffs and the members of the ERISA Class by, *inter alia*, failing to promptly pay premiums for said welfare benefit plans, as required under ERISA and under the terms of the respective plans.

1118.   As a result of Defendants' breach of their fiduciary duties, Plaintiffs and the members of the ERISA Class have been harmed by, *inter alia*, having said welfare benefit plans incur lapses and/or terminate without notice, and being denied health, dental and life insurance benefits.

1119.   As a result of Defendants' breach of their fiduciary obligations and the ensuing harm it created, Plaintiffs and the members of the ERISA Class are entitled to monetary damages, reasonable attorneys' fees and costs, and equitable and any and all other available and appropriate relief.

## ELEVENTH CAUSE OF ACTION
### (Fraud in the Inducement)

1120.   Plaintiffs, on behalf of themselves and the New York Common Law Class, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1121.   Defendants are liable for the following material misrepresentations made by Defendants and their agents to induce Plaintiffs and the New York Common Law Class to be employed for and continue employment with Defendants:

   a.   Plaintiffs and the New York Common Law Class would be entitled to receive employer-funded GTL benefits;

   b.   Defendants would provide Plaintiffs and the New York Common Law Class with "GTL coverage equal to 3 times annual salary to a maximum of $300,000 at no cost to you;"

   c.   If you receive "coverage in excess of $50,000, the value of this benefit will appear as taxable income to you based on

your age and the amount of coverage provided during the year;"

d.    Defendants "provide eligible employees with Basic Life Insurance at no cost to you;"

e.    "RMJM offers insurance coverage for their employees and their qualified dependents for medical and dental expenses"

f.    Health insurance is a "core benefit" of employment with RMJM;

g.    Ms. LaCava would be paid six months of severance in the event her employment with RMJM was involuntarily separated;

h.    Ms. LaCava was told by Defendants' Human Resources personnel that Defendants reduced this offer to two months of severance;

i.    Mr. Conroy being promised "the severance and vacation benefits owed to [him];"

j.    Defendant Bailes stating to Mr. Conroy that he was owed $10,000 in severance;

k.    Non-Principals would be paid severance in the event their employment with RMJM employment was involuntarily separated on the following basis: (a) "5 days" of severance for persons employed for "90 days but less than 1 year"; (b) "10 days" of severance for persons employed "one year but less than 5 years;" and (c) "10 days plus one additional day of severance for each full year of service beginning at year six" for persons employed "Five years +."

l.    Imputed taxable income on account of purported payment of GTL premiums appearing on wage statements of Plaintiffs and the New York Common Law Class;

m.    Wage statements showing that Defendants were deducting wages from Plaintiffs and the New York Common Law Class for benefits premiums including but not limited to health insurance, dental insurance and GTL;

    n.      Wage statements showing that Defendants were making 401(k) Employee Elective Deferrals for said Plaintiffs and the New York Common Law Class; and

    o.      Numerous statements that wage and other compensation payments would be forthcoming.

1122.  Defendants knew, or should have known, that these misrepresentations were false.

1123.  Defendants authorized, acquiesced in and/or ratified these false statements with scienter.

1124.  These false representations were made knowingly, or with a willful, wanton and reckless disregard for the truth, and were intended to deceive and defraud Plaintiffs and the New York Common Law Class and induce them to remain employed with Defendants.

1125.  Plaintiffs and the New York Common Law Class reasonably relied upon these misrepresentations by agreeing to work and continuing to work for Defendants.

1126.  Plaintiffs and the New York Common Law Class further relied upon these misrepresentations by continuing to work for Defendants, not taking necessary actions to convert the GTL policy to an individual policy, not taking necessary actions to obtain a replacement life insurance policy, and not otherwise taking the necessary actions to ensure continuation of life insurance coverage.

1127.  Plaintiffs and the New York Common Law Class further relied upon these misrepresentations by continuing to work for Defendants, not taking necessary actions to ensure coverage under and continuation of all other benefits as well.

1128.  Plaintiffs and the New York Common Law Class further relied upon these misrepresentations by agreeing to work and continuing to work for Defendants and not taking the necessary steps to receive payment of the monies taken from them under the false pretenses that the money was being used to pay for benefits.

1129.   Defendants knew, or reasonably should have known, that they possessed superior knowledge and information concerning this, and related matters, and that Plaintiffs and the New York Common Law Class would rely upon these misrepresentations.

1130.   Plaintiffs and the New York Common Law Class' reasonable reliance upon these misrepresentations have caused Plaintiffs and the New York Common Law Class to suffer damages separate and distinct from the other causes of action alleged herein.

1131.   Specifically, Plaintiffs and the New York Common Law Class have suffered, and continue to suffer, from continued work for Defendants despite non-payment of wages, benefits and other compensation, the cancellation of the GTL policy, the inability to convert the GTL policy to an individual policy, the inability to replace the GTL policy and the inability to otherwise ensure continuation of life insurance benefits.

1132.   Moreover, Plaintiffs and the New York Common Law Class reasonable reliance resulted in damages for Plaintiffs agreeing to work and continuing to work for Defendants.

1133.   Defendants' unlawful fraudulent actions were knowing, willful and wanton, and/or done in reckless disregard for Plaintiffs and the New York Common Law Class' well-being, entitling them to an award of punitive damages.

### TWELFTH CAUSE OF ACTION
**(Fraud in the Concealment)**

1134.   Plaintiffs, on behalf of themselves and the New York Common Law Class, hereby repeat and reallege each and every allegation contained in each of the preceding paragraphs as if fully set forth and contained herein.

1135.   Defendants possessed material knowledge and information regarding the non-payment and/or late-payment of premiums for GTL and health and dental insurance, and the

cancellation of these policies that they fraudulently concealed from Plaintiffs and the New York Common Law Class.

1136.   This and other material knowledge and information was not publicly available, or otherwise readily available to Plaintiffs and the New York Common Law Class, except through Defendants.

1137.   Defendants knew, or reasonably should have known, that such knowledge and information was not readily available to Plaintiffs and the New York Common Law Class, that Plaintiffs and the New York Common Law Class were relying on Defendants to provide such information, and that Plaintiffs and the New York Common Law Class were acting on the basis of false or misleading information and/or impressions when they continued to work for Defendants despite non-payment of premiums and cancellation of the GTL policy, did not convert the GTL policy to an individual policy, did not replace the GTL policy and did not otherwise ensure continuation of life insurance benefits.

1138.   As such, Defendants owed Plaintiffs and the New York Common Law Class a duty to disclose this and all other material knowledge and information regarding non-payment of GTL premiums and the cancellation of the GTL policy and the health and dental insurance policies.

1139.   Defendants knowingly, or with a willful, wanton and reckless disregard for Plaintiffs and the New York Common Law Class, concealed this material knowledge and information from Plaintiffs and the New York Common Law Class.

1140.   Defendants' material omissions of fact were intended to deceive and defraud Plaintiffs and the New York Common Law Class to continue to work for Defendants and to not

take any actions to convert their GTL policy to an individual policy or take other potential

actions to continue the life insurance benefits absent payment of the premiums by Defendants.

1141.   Plaintiffs and the New York Common Law Class' reasonable reliance upon these

concealments and omissions have caused Plaintiff s and the New York Common Law Class to

suffer damages separate and distinct from the other causes of action alleged herein.  Specifically,

Plaintiffs and the New York Common Law Class have suffered, and continue to suffer, from the

continued work for Defendants despite non-payment of premiums, the cancellation of said

policies, the inability to convert the GTL policy to an individual policy, the inability to replace

the GTL policy, and the inability to otherwise ensure continuation of life insurance benefits or

recoup the monies taken from them under the false pretense that same was being used to pay for

benefits.

### THIRTEENTH CAUSE OF ACTION
### (Promissory Estoppel)

1142.   Plaintiffs, on behalf of themselves and the New York Common Law Class, hereby

repeat and reallege each and every allegation as contained in each of the preceding paragraphs as

if fully set forth and contained herein.

1143.   As part of Defendants' efforts to induce Plaintiffs and the New York Common

Law Class to continue working for Defendants, Defendants promised to provide Plaintiffs and

the New York Common Law Class with GTL and health and dental insurance.  Defendants' also

promised to pay certain Plaintiffs severance as described above.

1144.   Plaintiffs and the New York Common Law Class reasonably and foreseeably

relied upon these promises to their detriment by continuing to work for Defendants despite

Defendants' non-payment of GTL, health and dental insurance premiums and the cancellation of

these policies.  Plaintiffs also relied on the promises of severance by not voluntarily ending their employment with Defendants.

1145.   Plaintiffs and the New York Common Law Class further reasonably and foreseeably relied upon these promises to their detriment when they did not take necessary actions to convert the GTL policy to an individual policy and did not take other available actions to ensure the continuation of life insurance benefits or recoup the monies taken from them based on the promise that same was being used to pay for benefits.

1146.   Based upon Plaintiffs and the New York Common Law Class' reasonable and foreseeable, detrimental reliance upon these promises, Defendants were estopped from failing to pay premiums for GTL and health and dental insurance they promised to pay and were further estopped from allowing the cancellation of these policies, particularly without any notice to Plaintiffs and the New York Common Law Class.  Defendants were also estopped from failing to pay severance pursuant to the promises described above.

1147.   As a direct result of Plaintiffs and the New York Common Law Class' reasonable and foreseeable reliance upon these and all related promises, Plaintiffs and the New York Common Law Class suffered, and continue to suffer, from the continued work for Defendants despite non-payment of premiums, the cancellation of the GTL policy, the inability to convert the GTL policy to an individual policy, the inability to replace the GTL policy, the inability to otherwise ensure continuation of life insurance benefits, the inability to recoup the monies taken from them based on the promise that same was being used to pay for benefits and the non-payment of severance.

## FOURTEENTH CAUSE OF ACTION
### (Unjust Enrichment)

1148.   Plaintiffs, on behalf of themselves individually and the New York Common Law
Class, hereby repeat and reallege each and every allegation as contained in each of the preceding
paragraphs as if fully set forth and contained herein.

1149.   Defendants were enriched by Plaintiffs' agreement to work and continued work
for Defendants.  As such, Defendants' enrichment was at Plaintiffs' expense.

1150.   Plaintiffs were not compensated or provided other consideration in accordance
with the agreed upon terms of employment and were further subjected to statutory violations.  As
such, Defendants' retention of the benefit of Plaintiffs' agreement to work and continued work
for Defendants was and is unjust.

1151.   As a direct result of Defendants' conduct alleged herein, equity and good
conscience requires Defendants to make restitution to Plaintiffs of the compensation and other
consideration which was not paid and withheld from Plaintiffs, in addition to punitive damages
and all other available relief.

## FIFTEENTH CAUSE OF ACTION
### (Breach of Contract)

1152.   Plaintiffs, on behalf of themselves individually and the New York Common Law
Class, hereby repeat and reallege each and every allegation as contained in each of the preceding
paragraphs as if fully set forth and contained herein.

1153.   At all relevant times herein, Defendants and each of the Plaintiffs and the
members of the New York Common Law Class entered into enforceable contracts whereby each
of the Plaintiffs and the members of the New York Common Law Class agreed to provide work
and service to Defendants, and in exchange, Defendants agreed to provide wages, benefits, wage

supplements, accrued paid vacation, severance, and other consideration, including Employee Elective Deferrals.

1154.   Plaintiffs and the members of the New York Common Law Class each had a meeting of the minds with Defendants as to all of the essential terms and conditions of employment and compensation.

1155.   As a result, Plaintiffs and the members of the New York Common Law Class each had enforceable contractual terms of employment with Defendants.

1156.   Defendants breached these contracts when they failed to provide Plaintiffs and the members of the New York Common Law Class with the agreed upon wages, benefits, accrued paid vacation, severance, other wage supplements and Employee Elective Deferrals.

1157.   Defendants' breaches of contract have caused Plaintiffs and the members of the New York Common Law Class to suffer damages, including but not limited to, a loss of wages, benefits, accrued paid vacation, severance, other wage supplements and Employee Elective Deferrals, and a loss of time spent providing work and service to Defendants which was not compensated for based on the agreed terms.

1158.   Defendants' unlawful fraudulent actions were intentional, willful and wanton, and/or done in reckless disregard for Plaintiffs and the New York Common Law Class' rights, thus entitling Plaintiffs and the members of the New York Common Law Class to an award of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves, the FLSA Collective, the NYLL

Class, the IRC Class, the New York Common Law Class, and the ERISA Class respectfully

request that this Court:

A.    Declare that the practices complained of herein are unlawful under applicable

federal and state law;

B.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C.

§ 216(b), and direct Defendants to provide Plaintiffs with a list of all persons who were/are

employed by Defendants in the United States and were not paid the minimum wage for all hours

worked or premium overtime compensation for all hours worked in excess of 40 hours per week

during the relevant period, including all last known addresses, telephone numbers and e-mail

addresses of each such person so Plaintiffs can give such persons notice of this action and an

opportunity to make an informed decision about whether to participate in it;

C.    Determine the damages sustained by Plaintiffs and the FLSA Collective as a

result of Defendants' violations of the FLSA, and award those damages against Defendants and

in favor of Plaintiffs and the FLSA Collective, plus such pre-judgment and post-judgment

interest as may be allowed by law;

D.    Designate Plaintiffs' counsel of record as counsel for the FLSA Collective;

E.    Award Plaintiffs and the FLSA Collective an additional equal amount as

liquidated damages because Defendants' violations were willful and/or without a good faith

basis;

F.    Declare the claims brought on behalf of the NYLL Class to be maintainable as a

class action pursuant to Fed. R. Civ. P. 23, and direct Defendants to provide Plaintiffs with a list

of all persons who were/are employed by Defendants in New York during the relevant period, including all last known addresses, telephone numbers and e-mail addresses of each such person so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

      G.     Declare the claims brought on behalf of the IRC Class to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and direct Defendants to provide Plaintiffs with a list of all persons who were/are employed by Defendants in the United States during the relevant period, including all last known addresses, telephone numbers and e-mail addresses of each such person so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

      H.     Declare the claims brought on behalf of the ERISA Class to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and direct Defendants to provide Plaintiffs with a list of all persons who were/are employed by Defendants in New York during the relevant period, including all last known addresses, telephone numbers and e-mail addresses of each such person so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

      I.     Declare the claims brought on behalf of the New York Common Law Class to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and direct Defendants to provide Plaintiffs with a list of all persons who were/are employed by Defendants in New York during the relevant period, including all last known addresses, telephone numbers and e-mail addresses of each such person so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

J.      Designate Plaintiffs as a representative of the NYLL Class, the IRC Class, the

ERISA Class and the New York Common Law Class, and their counsel of record as class

counsel;

K.      Determine the damages sustained by Plaintiffs, the NYLL Class, the IRC Class,

the ERISA Class and the New York Common Law Class as a result of Defendants' violations of

the NYLL, the IRC, New York State common law, and ERISA, and award those damages

against Defendants and in favor of Plaintiffs, the NYLL Class, the IRC Class, the ERISA Class

and the New York Common Law Class, plus such pre-judgment and post-judgment interest as

may be allowed by law;

L.      Award Plaintiffs and the NYLL Class an additional amount of liquidated damages

pursuant to the NYLL because Defendants' violations were willful and/or without a good faith

basis;

M.      Award Plaintiffs and the IRC Class an award of punitive damages;

N.      Award Plaintiffs and the ERISA Class an award of punitive damages;

O.      Award Plaintiffs and the New York Common Law Class an award of punitive

damages;

P.      Award Plaintiffs, the FLSA Collective, the NYLL Class, the IRC Class, the

ERISA Class and the New York Common Law Class, their reasonable attorneys' fees and costs

and disbursements in this action including, but not limited to, any accountants' or experts' fees;

and

Q.      Grant Plaintiffs, the FLSA Collective, the NYLL Class, the IRC Class, the ERISA

Class, and the New York Common Law Class such other and further relief that the Court deems

just and proper.

**JURY DEMAND**

Plaintiffs, on behalf of themselves individually, the FLSA Collective, the NYLL Class, the IRC Class, the ERISA Class and the New York Common Law Class, hereby demand a trial by jury on all issues of fact and damages.

Dated: February 8, 2013
New York, New York

Respectfully submitted,

THOMPSON WIGDOR LLP

By: _____

Douglas H. Wigdor
David E. Gottlieb
Michael J. Willemin

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@thompsonwigdor.com
dgottlieb@thompsonwigdor.com
mwillemin@thompsonwigdor.com

*Counsel for Plaintiffs and Proposed Counsel for the FLSA Collective, the NYLL Class, the IRC Class, the ERISA Class and the New York Common Law Class*